# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NATHAN LINDEN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| v. | |
| THE BANCORP, INC., DAMIAN M. KOZLOWSKI, and PAUL FRENKIEL, | |
| Defendants. | |

# CLASS ACTION COMPLAINT
# <u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

Plaintiff Nathan Linden ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by The Bancorp, Inc. ("Bancorp" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Bancorp; and (c) review of other publicly available information concerning Bancorp.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired Bancorp securities between January 25, 2024 and March 4, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Bancorp is a financial holding company that generates majority of its revenue and income through its primary wholly owned subsidiary, The Bancorp Bank, National Association (the "Bank"). Bancorp engages in institutional banking, commercial real estate bridge lending, small business lending and commercial fleet leasing. The Company's commercial real estate bridge loans ("REBLs") are primarily collateralized by apartment buildings. In 2024, the Company also began making consumer fintech loans, which consist of short-term extensions of credit including secured credit card loans, fixed term loans, payroll advances and others, made in conjunction with marketers and servicers.

3.     On March 21, 2024, at approximately 9:45 AM EST, Culper Research issued a report, alleging that the Company had underrepresented significant risks of default and/or loss on

1

certain REBL loans. The report alleged the Company's loan book is "rife with unsophisticated syndicated borrowers" who were "coaxed by promises of generational wealth through passive income" with "get rich quick" promises. The report alleged that the Company's REBL loan portfolio is filled with apartments which are "quite literally, crumbling," with high vacancies and multiple condemnations. The report stated the Company "blindly reassures investors that its book contains 'no substantial risk of default or loss,'" but, in reality, the Company's "REBL portfolio faces meaningful risks and will result in meaningful losses." The report concluded that the Company's reserve of only "$4.7 million in REBL loan allowances, representing a mere 0.24% of the total REBL book" is "short by an order of magnitude or more."

4.      On this news, the Company's share price fell $3.63, or 10.15%, to close at $32.12 per share on March 21, 2024, on unusually heavy trading volume.

5.      Then, on October 24, 2024, after the market closed, the Company announced its third quarter 2024 financial results in a press release for the period ended September 30, 2024, reporting $51.5 million in net income. The Company attributed the results in part, to "a new CECL [current expected credit losses methodology] factor" to the Company's analysis of REBL loans classified as either special mention or substandard "which increased the provision for credit losses and resulted in an after-tax reduction in net income of $1.5 million." The Company further explained its results also reflected "prior period interest income reversals on real estate bridge loans transferred to nonaccrual or modified" which "resulted in an after-tax reduction in net income of $1.2 million."

6.      On this news, the Company's share price fell $7.95, or 14.47%, to close at $47.01 per share on October 25, 2024, on unusually heavy trading volume.

7. Finally, on March 4, 2025, after the market closed, Bancorp disclosed that its "financial statements for the fiscal years ended December 31, 2022 through 2024 as shown in the Annual Report should no longer be relied upon." The Company explained that its auditors for those years "did not provide approval to include [the] audit opinion . . . or [the] consent to the incorporation by reference of their audit report in certain registration statements." The Company further revealed it is "working expeditiously to perform and complete additional closing procedures related to accounting for consumer fintech loans in the allowance for credit losses" in order to file an amended annual report. The Company also revealed it "is evaluating the impact of this non-reliance on its conclusions regarding disclosure controls and procedures and internal control over financial reporting." As a result of the foregoing, the Company stated it would be unable to file timely its fiscal year 2024 annual report.

8. On this news, the Company's share price fell $2.34, or 4.38%, to close at $51.25 per share on March 5, 2025, on unusually heavy trading volume.

9. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Bancorp had underrepresented the significant risk of default or loss on its REBL loan portfolio; (2) that the Company's current expected credit loss methodology was insufficient to account for the provision and/or allowance of credit losses; (3) that, as a result of the foregoing, the Company was reasonably likely to increase its provision for credit losses; (4) that there were material weakness in its internal control over financial reporting; (5) that its financial statements had not been approved by its independent auditor; (6) that, as a result of the foregoing, the Company's financial statements could not be relied upon; and (7) that, as a result of the foregoing, Defendants' positive statements about

the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff Nathan Linden, as set forth in the accompanying certification, incorporated by reference herein, purchased Bancorp securities during the Class Period, and suffered damages

4

as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.    Defendant Bancorp is incorporated under the laws of Delaware with its principal executive offices located in Wilmington, Delaware. Bancorp's common stock trades on the NASDAQ exchange under the symbol "TBBK."

17.    Defendant Damian M. Kozlowski ("Kozlowski") was the Company's Chief Executive Officer ("CEO") at all relevant times.

18.    Defendant Paul Frenkiel ("Frenkiel") was the Company's Chief Financial Officer ("CFO") at all relevant times.

19.    Defendants Kozlowski and Frenkiel (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**Background**</u>

20.    Bancorp is a financial holding company that generates the majority of its revenue and income through its primary wholly owned subsidiary, The Bancorp Bank, National

Association (the "Bank"). Bancorp engages in institutional banking, commercial real estate bridge lending, small business lending and commercial fleet leasing. The Company's commercial real estate bridge loans ("REBLs") are primarily collateralized by apartment buildings. In 2024, the Company also began making consumer fintech loans which consist of short-term extensions of credit including secured credit card loans, fixed term loans, payroll advances and others, made in conjunction with marketers and servicers.

### Materially False and Misleading

### Statements Issued During the Class Period

21.     The Class Period begins on January 25, 2024.[1] On that day, the Company announced its fourth quarter and full year 2023 financial results in a press release that stated, in relevant part:

**Highlights**

- The Bancorp reported ***net income of $44.0 million, or $0.81 per diluted share, for the quarter ended December 31, 2023, compared to net income of $40.2 million, or $0.71 per diluted share, for the quarter ended December 31, 2022***. Excluding the tax effected impact of a $10.0 million provision for credit loss on its only trust preferred security, non-GAAP adjusted diluted earnings per share amounted to $0.95.*

- Return on assets and equity for the quarter ended December 31, 2023 amounted to 2.4% and 22%, respectively, compared to 2.1% and 24%, respectively, for the quarter ended December 31, 2022 (all percentages "annualized").

- Net interest income increased 20% to $92.2 million for the quarter ended December 31, 2023, compared to $76.8 million for the quarter ended December 31, 2022. Net interest income increases reflected the impact of Federal Reserve rate increases on The Bancorp's variable rate loans and securities.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

- Net interest margin amounted to 5.26% for the quarter ended December 31, 2023, compared to 4.21% for the quarter ended December 31, 2022, and 5.07% for the quarter ended September 30, 2023.

*    *    *

- ***December 31, 2023, real estate bridge loans of $2.00 billion had grown 8% compared to the $1.85 billion balance at September 30, 2023, and 20% compared to the December 31, 2022 balance of $1.67 billion. These real estate bridge loans consist entirely of apartment buildings***.

22.     Also on January 25, 2025, Bancorp hosted a conference call in connection with these results, which was accompanied by its January 2024 Investor Presentation. The investor presentation touted that the Company's "Core lending businesses" are "***comprised of our main, lower risk lending activities.***" The investor presentation assured investors the Company's new "Fintech solutions" came with an "[e]stablished risk and compliance function [which] is highly scalable." The investor report continued, touting the Company's "deposit growth from fintech business" as well as the Company's purportedly "stable deposits & significant balance sheet liquidity." The investor report reported the Company's REBL portfolio as part of the Company's "***lower risk loan portfolio***" and further assured investors that its "***allowance for credit losses reflects [its] lower-risk loan portfolio.***"  Finally, the investor presentation concluded with the Company's financial metrics including allowances for credit losses. Specifically, the investor presentation stated the following, in relevant part:



23. On February 29, 2024, the Company submitted its annual report for the fiscal year ended December 31, 2023 on Form 10-K filed with the SEC, affirming the previously reported financial results (the "FY23 10-K"). The FY23 10-K claimed that the Company "review[s] the adequacy of our ACL [allowance for credit losses] on at least a quarterly basis to determine a provision for credit losses to maintain our allowance at a level we believe is appropriate to recognize current expected credit losses." Specifically, the FY23 10-K stated, in relevant part:

*Allowance for Credit Losses*

**We review the adequacy of our ACL on at least a quarterly basis to determine a provision for credit losses to maintain our allowance at a level we believe is appropriate to recognize current expected credit losses.** Our Chief Credit Officer oversees the loan review department, which measures the adequacy of the ACL independently of loan production officers.

*                    *                    *

**We determine our allowance for credit losses with the objective of maintaining an allowance level we believe to be sufficient to absorb our estimated current and future expected credit losses. We base our determination of the adequacy of the allowance on periodic evaluations of our loan portfolio and other relevant factors.**

*                    *                    *

We periodically review our investment portfolio to determine whether unrealized losses on securities result from credit, based on evaluations of the creditworthiness of the issuers or guarantors, and underlying collateral, as applicable. In addition, we consider the continuing performance of the securities. We recognize credit losses through the consolidated statements of operations. If management believes market value losses are not credit related, we recognize the reduction in other comprehensive income, through equity. Our evaluation of whether a credit loss exists is sensitive to the following factors: (a) the extent to which the fair value has been less than the amortized cost of the security, (b) changes in the financial condition, credit rating and near-term prospects of the issuer, (c) whether the issuer is current on contractually obligated interest and principal payments, (d) changes in the financial condition of the security's underlying collateral, and (e) the payment structure of the security. If a credit loss is determined, we estimate expected future cash flows to estimate the credit loss amount with a quantitative and qualitative process that incorporates information received from third-party sources and internal assumptions and judgments regarding the future performance of the security.

*                    *                    *

Our best estimate of fair value involves assumptions including, but not limited to, various performance indicators, such as historical and projected default and recovery rates, credit ratings, current delinquency rates, loan-to-value ratios and the possibility of obligor refinancing. **One significant input is that at December 31, 2023, $168.1 million of commercial real estate, at fair value are multi-family (apartment building) loans, a sector which has experienced relatively low historical losses on an industry wide basis.**

24.     The FY23 10-K reported the Company's "key performance indicators" ("KPI") and stated, among other things, that the "***the magnitude of credit losses is an additional KPI.***" The

9

FY23 10-K continued, alleging the Company has "***continued to target loan niches which we believe have lower credit risk than certain other forms of lending.***" Specifically, the FY23 10-K stated the following, in relevant part:

### Key Performance Indicators

In 2023, we recorded net income of $192.3 million compared to $130.2 million in 2022, with pre-tax income increasing to $256.8 million in 2023 from $177.9 million in 2022. The increases primarily reflected increases in net interest income resulting from the adjustment of variable rate loans and securities to Federal Reserve rate hikes. While we may pursue strategies to increase fixed rate securities purchases which could lower the decrease in net interest income resulting from future Federal Reserve rate reductions, there can be no assurance that these strategies, which depend on future yield curves, can be implemented. See "Asset and Liability Management".

We use a number of key performance indicators ("KPIs") to measure our overall financial performance and believe they are useful to investors because they provide additional information about our underlying operational performance and trends. We describe how we calculate and use a number of these KPIs and analyze their results below.

*       *       *

• *Net interest margin and credit losses*. Net interest margin is a KPI associated with net interest income, which is the largest component of our earnings and is the difference between the interest earned on our interest-earning assets consisting of loans and investments, less the interest on our funding, consisting primarily of deposits. Net interest margin is derived by dividing net interest income by average interest-earning assets. Higher levels of earnings and net interest income on lower levels of assets, equity and interest-earning assets are generally desirable. However, these indicators must be considered in light of regulatory capital requirements, which impact equity, and credit risk inherent in loans. Accordingly, the magnitude of credit losses is an additional KPI.

*       *       *

*Results of KPIs*

10

|  | As of and for the years ended December 31, | | |
|  | 2023 | 2022 | 2021 |
| Income Statement Data: | (in thousands, except per share data) | | |
| Net interest income | $ 354,052 | $ 248,841 | $ 210,876 |
| Provision for credit losses on loans | 8,330 | 7,108 | 3,110 |
| Provision for credit loss on security | 10,000 | — | — |
| Non-interest income | 112,094 | 105,683 | 104,749 |
| Non-interest expense | 191,042 | 169,502 | 168,350 |
| Net income available to common shareholders | $ 192,296 | $ 130,213 | $ 110,653 |
| Net income per share – diluted | $ 3.49 | $ 2.27 | $ 1.88 |
|  |  |  |  |
| Selected Ratios: |  |  |  |
| Return on average assets | 2.59% | 1.81% | 1.68% |
| Return on average common equity | 25.62% | 19.34% | 17.94% |
| Net interest margin | 4.95% | 3.55% | 3.35% |
| Book value per common share | $ 15.17 | $ 12.46 | $ 11.37 |
| Equity/assets | 10.48% | 8.78% | 9.53% |

***In the past three years, we have continued to target loan niches which we believe have lower credit risk than certain other forms of lending. These include*** SBLOC and IBLOC; SBA loans, a significant portion of which are government guaranteed or must have loan-to-value ratios lower than other forms of lending; leasing to which we have access to underlying vehicles; ***and real estate bridge lending for apartment buildings in selected national regions.*** The majority of these loan categories are variable rate and in 2023, adjusted more fully to Federal Reserve rate increases than did our deposits, which are derived primarily from our payments businesses. Average loans and leases grew to $5.73 billion in 2023 from $5.67 billion in 2022.

Increases in the above KPIs in 2023 reflected the impact of higher rates on loans and securities as a result of Federal Reserve rate increases, while the impact of loan growth in certain categories was offset by SBLOC and IBLOC payoffs. We believe that these payoffs reflected customer sensitivity to the increasing rate environment. Reflecting those higher rates, the net interest margin increased to 4.95% in 2023 from 3.55% in 2022 and return on assets and return on equity respectively amounted to 2.59% and 25.6%, compared to 1.81% and 19.3%. We attempt to manage increases in non-interest expense in conjunction with revenue increases, to achieve our budgetary projections. Increases in book value per common share and the equity to assets ratio primarily reflect earnings retention, net of the impact of share repurchases and changes in the value of available-for-sale securities.

25.     The FY23 10-K reported the Company's "***Evaluation of Disclosure Controls and Procedures***" including that the Company's "Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at a reasonable level of assurance as of December 31, 2023."

26.     The above statements identified in ¶¶ 21-25 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Bancorp had underrepresented the significant risk of default or loss on its REBL loan portfolio; (2) that the Company's current expected credit loss methodology was insufficient to account for the provision and/or allowance of credit losses; (3) that, as a result of the foregoing, the Company was reasonably likely to increase its provision for credit losses; (4) that there were material weakness in its internal control over financial reporting; (5) that its financial statements had not been approved by its independent auditor; (6) that, as a result of the foregoing, the Company's financial statements could not be relied upon; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

27.     The truth began to emerge on March 21, 2024, at approximately 9:45 AM EST, when Culper Research issued a report, alleging that the Company had underrepresented significant risk of default or loss on certain REBL loans (the "Culper Report"). The Culper Report alleged the Company's loan book is "rife with unsophisticated syndicated borrowers" who were "coaxed by promises of generational wealth through passive income" with "get rich quick" promises. The Culper Report alleged that the Company's REBL loan portfolio is filled with apartments which are "quite literally, crumbling," with high vacancies and multiple condemnations. The Culper Report stated that though the Company "blindly reassures investors that its book contains 'no substantial risk of default or loss'" in reality, Bancorp's "REBL portfolio faces meaningful risks and will result in meaningful losses." The Culper Report cited, in part, "conversations with former TBBK employees including a former REBL underwriter, and conversations with several of TBBK's

borrowers/syndicators" as well as a loan-by-loan analysis of certain of the Company's properties. The Culper Report concluded that the Company's reserve of only "$4.7 million in REBL loan allowances, representing a mere 0.24% of the total REBL book" is "short by an order of magnitude or more." Specifically, the Culper Report stated the following, in relevant part:

> We are short The Bancorp, Inc. ("TBBK", "the Company") because we believe the Company has misrepresented the quality of its real estate bridge loan ("REBL") portfolio. Over the past 10 quarters, TBBK's REBL book has ballooned from zero to $2 billion, or 2.5x the value of the Company's common equity and only provisioned $4.7 million. ***Despite widely acknowledged stress across TBBK's Class C Sunbelt markets, the Company claims that "we don't have any substantial risk of default and loss." We think otherwise.*** Utilizing UCCs, liens, deeds, and local property records, we uncovered loans totaling $141.6 million, or 50% of the Company's $283 million in loans coming due just this year, that we believe harbor meaningful risks. In Part 1 herein, we center our analysis on the 2H 2021 vintage loans, but we believe the rest of TBBK's book faces the same problems. To that end, we profile two additional 2022 vintage loans that we believe typify these problems. ***These properties are, quite literally, crumbling: ridden with crime, shootings, looting, infestations, fires, and even full-on condemnations, while vacancies remain high and rents have remained stagnant. Our views are not only informed by our loan-by-loan analysis, but by our visits to 21 different TBBK-funded properties in the past 2 weeks, our conversations with former TBBK employees including a former REBL underwriter, and conversations with several of TBBK's borrowers/syndicators.***
>
>      *       *       *
>
> ***TBBK's book also appears rife with unsophisticated syndicator borrowers.*** Unlike corporate borrowers with dry powder and the temperament to "extend and pretend", syndicators tend to work on a deal-by-deal or fund by fund basis, and thus don't have much breathing room, in our view. ***Our review of their marketing materials suggests investors have been coaxed by promises of generational wealth through passive income.*** For example:
>
> - One TBBK-funded property looks to have been funded in part by OwnProp, which sold "tokenized ownership stakes" in the deal and brags that investors can get in on the action for as little as $100. OwnProp claimed to potential investors that this particular TBBK-funded deal could generate returns of over 200%. We visited the property just days ago and noted that windows remained boarded up from a January 2024 fire. Per one resident, "my apartment building was completely on fire. Me and my son had to run for our lives..." Other residents complain of roach and rat infestations.

- Another TBBK borrower/syndicator encourages potential investors to complete just five steps to quit their jobs and generate "generational wealth in seven to ten years." The same syndicator practically bragged to us that "I love my doctors and lawyers" as LPs because they can't differentiate a good deal from a bad one.

- Yet another TBBK borrower/syndicator was a long-time network engineer before he started syndicating deals in 2020. He now runs a service teaching retail investors how to "build generational wealth" in multifamily. According to him, just "sit back and enjoy the checks!" Fittingly, TBBK itself sponsors an aptly named "LendingCon" event where noobie operators can learn how to lever up and buy properties.

In short, we view many of these loans as being driven by syndicators with "get rich quick" dreams who believed that they could easily rehab units, fill them with tenants, increase rents, and cash out for quick "passive" returns.

Yet we believe that for these properties, none of these things have happened: costs have skyrocketed, vacancies remain high, rents have remained relatively stagnant, and interest rates have more than doubled. As these loans come due, we believe that not only will many GP/LP stakes be wiped, but TBBK will face meaningful losses. To that end, TBBK's $4.7 million in reserves, at just 0.24% of its REBL book, are a total farce. *We could not find a single public lender who held fewer reserves than TBBK. The 17 other lenders we reviewed hold 4x to 7x TBBK's reserves. We also spoke with a former TBBK REBL underwriter who told us that they might expect TBBK's losses to be anywhere from 10x to 15x higher than the Company's actual reserves: "When loans come due, there will be potential issues where the value's just not there ... they are going to have to put cash into the deal to make it work or they'll just give the keys back."*

*                    *                    *

Yet amid both these challenges and the growing importance of the REBL book to TBBK, we find the Company's disclosures extremely opaque and underwhelming. For example, TBBK does not provide investors with quarterly or even annual metrics such as the underwritten cap rates, occupancy rates, NOIs, or DSCRs on the properties securing its underlying loans. Nor does it provide borrower metrics such as cash reserves. As such, investors have been left relatively in the dark as to the health of these loans. *TBBK instead blindly reassures investors that its book contains "no substantial risk of default or loss"*, per CEO Damian Kozlowski on the Q4 2023 conference call:

*"So it's -- we do have some deferments. This is very natural, though. No write-offs. No, we don't believe any substantial risk of default and loss but as you mature that port, it's hard to know whether it's just a maturing portfolio where you have some people who have finished the projects or it's more based on the economy, it's not abnormal we're not seeing anything abnormal yet ... sometimes they can't get the refrigerators or they can't -- they take longer than they expect in order to finish the*

14

*project, even though they might be leasing it up, they didn't finish 3 buildings. So this is common. Whether that's driven by economic what's happening in the economy, we don't believe that's the major factor in it. It's impossible that I can't give you an answer because I don't -- there's really not an answer."*

***We think these reassurances are totally empty; TBBK's REBL portfolio faces meaningful risks and will result in meaningful losses.***

### <u>TBBK's Reserve Levels Don't Pass the Laugh Test</u>

TBBK has reserved all of $4.7 million in REBL loan allowances, representing a mere 0.24% of the total REBL book. We think this is a total farce, and TBBK's reserves are short by an order of magnitude or more.

*                    *                    *

One former TBBK REBL underwriter we spoke with stated that traditionally, investors ought to expect 2% to 3% losses, but in the current environment, that could be higher: "Traditionally these loans have like a 2-3% loss rate.

I'd imagine they come up to that number ... maybe 50 or 75 basis points to the upside." TBBK's measly reserves also stand out when compared to other lenders. We could not identify a single public lender with lower loss reserves as a percentage of total loans, both on a consolidated basis or for TBBK's REBL book in isolation:

| Company | HQ | Price/Book | Loans | Allowance | Percentage |
|---|---|---|---|---|---|
| JPMorgan Chase (JPM) | New York | 1.8x | 1,344,948 | 22,420 | 1.67% |
| Wells Fargo (WFC) | California | 1.2x | 922,076 | 14,606 | 1.58% |
| PNC (PNC) | Pennsylvania | 1.2x | 316,717 | 4,791 | 1.51% |
| Regions Financial (RF) | Alabama | 1.1x | 96,803 | 1,576 | 1.63% |
| Axos Financial (AX) | Nevada | 1.4x | 18,516 | 252 | 1.36% |
| United Community Banks (UCBI) | Georgia | 1.0x | 18,111 | 208 | 1.15% |
| Simmons First National (SFNC) | Arkansas | 0.7x | 16,620 | 225 | 1.36% |
| Independent Bank Group (IBTX) | Texas | 0.8x | 14,559 | 152 | 1.04% |
| Resanant Corporation (RNST) | Mississippi | 0.7x | 12,153 | 199 | 1.63% |
| Customers Bancorp (CUBI) | Pennsylvania | 1.1x | 11,889 | 135 | 1.14% |
| Seacoast Banking of Florida (SBCF) | Florida | 1.0x | 9,914 | 149 | 1.50% |
| ConnectOne Bancorp (CNOB) | New Jersey | 0.7x | 8,345 | 82 | 0.98% |
| S&T Bancorp (STBA) | Pennsylvania | 0.9x | 7,653 | 108 | 1.41% |
| TriCo Bancshares (TCBK) | California | 1.0x | 6,794 | 122 | 1.79% |
| Southside Bancshares (SBSI) | Texas | 1.1x | 4,485 | 43 | 0.95% |
| Pathward Financial (CASH) | South Dakota | 1.8x | 4,373 | 54 | 1.23% |
| First Internet Bancorp (INBK) | Indiana | 0.8x | 3,840 | 39 | 1.01% |
| Group Median | | 1.0x | | | 1.36% |
| Group Average | | 1.1x | | | 1.35% |
| The Bancorp (TBBK): Consolidated | South Dakota | 2.5x | 5,334 | 27 | 0.51% |
| The Bancorp (TBBK): REBL Loans | South Dakota | 2.5x | 2,000 | 5 | 0.24% |

*Source: company-by-company annual reports*

Finally, our loan-by-loan analysis of TBBK loans funded in the second half of 2021 alone suggests that the Company ought to be reserving far more than $4.7 million.

### <u>Our Loan-By-Loan Analysis Suggests Significant Underlying Issues</u>

15

We've uncovered at least 7 loans TBBK extended in the second half of 2021 alone, that per our research are not only less than 90% occupied but subject to problems such as infestations, crime, fires, and even condemnations.

*        *        *

However, the properties we profile herein suffer from both minimal rent increases and high vacancies, even as loans approach maturity.

| Name of Apartments | Property Address | Built | Loan Date | Loan | Total Price | LTV | Units |
|---|---|---|---|---|---|---|---|
| Aspire Richmond Hill | 526 Richmond Hill Rd W, Augusta, GA | 1971 | Aug-21 | $16.3 | $21.8 | 75% | 126 |
| The Aubrey | 2310 Crescent Park Dr, Houston, TX | 1978 | Oct-21 | $39.4 | $49.3 | 80% | 436 |
| [Unnamed Apartments] | 501-515 W 7th Street, Plainfield, NJ | 1925 | Oct-21 | $12.3 | $14.6 | 84% | 84 |
| Capewood Apartments | 4335 Aldine Mail Route Rd, Houston, TX | 1976 | Nov-21 | $12.3 | $15.3 | 80% | 176 |
| Riverpark at Kensington | 7803 S Wheeling Ave, Tulsa, OK | 1982 | Dec-21 | $31.2 | $33.5 | 93% | 400 |
| The Aliso | 807 Flame Circle, San Antonio, TX | 1965 | Dec-21 | $13.0 | $16.2 | 80% | 176 |
| Harrison Grant Apartments | 4210 Fredericksburg Rd, Balcones Heights, TX | 1974 | Dec-21 | $17.2 | $22.9 | 75% | 327 |
| | | | | $141.6 | $173.5 | | |

*Source: UCCs, liens, deeds, corporate filings, property records, and a market leading real estate data provider.*

In total, we estimate these loans represent $141.6 million in principal, or 50% of the Company's $283 million in REBL loans coming due in 2024 alone.

*        *        *

## **Borrowers Don't Have Any Good Options, In Our View**

We believe many of TBBK's borrowers are left in a precarious position. When loans come due, we see four main options: agency refinancing, non-agency refinancing, "extending and pretending", and foreclosing. Borrowers ideally hope to obtain agency refinancing. However, GSEs have strict requirements, including 90% occupancy for at least 90 days and 1.25x DSCR coverage. We believe many properties will simply fail to meet these requirements due to high vacancies, poor DSCR coverage given stalled-out rents and increasing costs, or both.

If borrowers opt to refinance, non-agency multifamily bridge rates now range from 9% to over 15%.27 TBBK's own realized interest rate was 9.30% in Q4 2023.28 We believe this scenario effectively wipes borrowers' equity while cutting into TBBK's own loans. Illustratively, consider that as of Q4 2023, TBBK disclosed $2,000 million in principal across 148 REBLs at a 72% weighted-average LTV, implying an average loan size of $13.5 million against total initial purchase price of $18.8 million per property.

*        *        *

Alternatively, borrowers could extend their loans, which often requires paying extension fees, pledging more equity, and/or re-upping rate caps. We suspect that as many of TBBK's borrowers are retail-oriented syndicates working on a deal-by-

deal or fund-by-fund basis, they lack the spare capital or ability to raise more capital.

Moreover, even if they extend, these borrowers still remain with the problem of higher interest rates as 3-year caps have expired, and the cost to renew is now astronomical.30 Consider that – again illustratively – as 3-year caps expire, interest expense on the average $13.5 million loan is set to jump from $0.54 million at a 4% rate to now $1.35 million at a 10% rate. Yet at 7% underwritten cap rates, these same properties are only generating $1.31 million in NOI – the increased interest expense wipes out the property's entire NOI.31 Finally, given the structural state of many of these properties (extremely old buildings in Class C markets, subject to crime, infestations, fires, condemnations, etc.), it's unclear to us that a 1- or even 2-year extension would provide borrowers with sufficient timelines to stabilize these properties.

Third, TBBK could foreclose and flip the property to a new buyer, simply hoping and praying to get back their principal. However, given that property values – especially in TBBK's Class C Sunbelt markets – have fallen precipitously since these deals were underwritten, we don't think TBBK would obtain much for the properties, especially as a forced seller, and even ignoring transaction costs.

                    *                    *                    *

We thus see problems for TBBK regardless of which option borrowers choose. If we assume that roughly half of TBBK's loan book – in line with our view of the 2H 2021 loans – come to maturity with problems, this would represent $1.0 billion in "problem" loans. ***At our midpoint estimate of 35% discounts to these loans per the above, TBBK would take $350 million in losses/write-downs, or 43% of the Company's total book value.***

28.    On this news, the Company's share price fell $3.63, or 10.15%, to close at $32.12 per share on March 21, 2024, on unusually heavy trading volume.

29.    On April 25, 2024, the Company announced its first quarter 2024 financial results in a press release for the period ended March 31, 2024. Among other things, the press release purported to reassure investors that Bancorp "***emphasizes safety and soundness***" in its balance sheet and that underwriting its REBL portfolio purportedly involves "***review[ing] prospective borrowers' previous rehabilitation experience in addition to overall financial wherewithal***." Specifically, the press release reported the following, in relevant part:

*- The Bancorp reported net income of $56.4 million, or $1.06 per diluted share ("EPS"), for the quarter ended March 31, 2024, compared to net income of $49.1 million, or $0.88 per diluted share, for the quarter ended March 31, 2023, or an EPS increase of 20%.* While net income increased 15% between these periods, outstanding shares were decreased as a result of common stock share repurchases which have been significantly increased in 2024.

-Return on assets and equity for the quarter ended March 31, 2024, amounted to 3.0% and 28%, respectively, compared to 2.6% and 28%, respectively, for the quarter ended March 31, 2023 (all percentages "annualized").

-Net interest income increased 10% to $94.4 million for the quarter ended March 31, 2024, compared to $85.8 million for the quarter ended March 31, 2023. Net interest income increases reflected the impact of Federal Reserve rate increases on The Bancorp's variable rate loans and securities.

-Net interest margin amounted to 5.15% for the quarter ended March 31, 2024, compared to 4.67% for the quarter ended March 31, 2023, and 5.26% for the quarter ended December 31, 2023. As noted above, the Company has begun purchasing fixed rate securities to reduce margin exposure to lower rate environments.

\*     \*     \*

*- The Bancorp emphasizes safety and soundness and its balance sheet has a risk profile enhanced by the special nature of the collateral supporting its loan niches, related underwriting, and the characteristics of its funding sources, including those highlighted in the bullets below.* Those loan niches and funding sources have contributed to increased earnings levels, even during periods in which markets have experienced various economic stresses.

\*     \*     \*

- In its real estate bridge lending portfolio, The Bancorp has minimal exposure to non-multifamily commercial real estate such as office buildings, and instead has a portfolio largely comprised of rehabilitation bridge loans for apartment buildings. These loans generally have three year terms with two one-year extensions to allow for the rehabilitation work to be completed and rentals stabilized for an extended period, before being refinanced at lower rates through U.S. Government Sponsored Entities or other lenders. The rehabilitation real estate lending portfolio consists primarily of workforce housing, which we consider to be working class apartments at more affordable rental rates. Related collateral values should accordingly be more stable than higher rent properties, even in stressed economies. *While the macro-economic environment has challenged the multifamily bridge space, the stability of The Bancorp's rehabilitation bridge loan portfolio is evidenced by the estimated values of collateral for loans that have been classified as substandard.* Recent third party appraisals of those loans reflect a weighted average "as is" loan to value ratio ("LTV") of 79% and an "as stabilized" LTV of 76%. Accordingly,

even with a higher interest rate environment and other stresses, LTVs for these loans have been significantly sustained and continue to provide protection against potential loss.

- ***As part of the underwriting process, The Bancorp reviews borrowers' previous rehabilitation experience in addition to overall financial wherewithal. These transactions also include significant borrower equity contributions with required performance metrics.*** Underwriting generally includes, but is not limited to, assessment of local market information relating to vacancy and rental rates, review of post rehabilitation rental rate assumptions against geo-specific affordability indices, negative news and lien searches, visitations by bank personnel and/or designated engineers, and other information sources.

30.     On May 10, 2024, the Company submitted its quarterly report for the period ended March 31, 2024 on Form 10-Q filed with the SEC, affirming the previously reported financial results. The report claimed the Company's purported provision and allowance for credit losses procedures involved, in part, "review[ing] the adequacy of our ACL on at least a quarterly basis to determine a provision for credit losses to maintain our ACL at a level we believe is appropriate to recognize current expected credit losses." Specifically, the quarterly report stated the following, in relevant part:

*Provision for Credit Losses*

Our provision for credit losses was $2.2 million for the first quarter of 2024 compared to a provision of $1.9 million for the first quarter of 2023. ***The ACL was $28.7 million, or 0.53% of total loans, at March 31, 2024, compared to $27.4 million, or 0.51% of total loans, at December 31, 2023.*** The higher ratio at March 31, 2024 reflected the impact of higher leasing net charge-offs, primarily in long haul and local trucking, transportation and related activities for which total exposure was approximately $39 million at March 31, 2024. We believe that our ACL is appropriate and supportable.

*              *              *

*Allowance for Credit Losses*

***We review the adequacy of our ACL on at least a quarterly basis to determine a provision for credit losses to maintain our ACL at a level we believe is appropriate to recognize current expected credit losses.*** Our Chief Credit Officer oversees the loan review department, which measures the adequacy of the ACL independently

of loan production officers. For detailed information on the ACL methodology, see "Note 6. Loans" to the unaudited consolidated financial statements herein.

At March 31, 2024, the ACL amounted to $28.7 million, which represented a $1.4 million increase compared to the $27.4 million ACL at December 31, 2023. The increase reflected the impact of higher net charge-offs.

31.    The first quarter 2024 quarterly report further claimed that the Company maintained "disclosure controls and procedures were effective at a reasonable level of assurance as of March 31, 2024."

32.    On July 25, 2024, the Company announced its second quarter 2024 financial results in a press release for the period ended June 30, 2024. Among other things, the press release purported to reassure investors that Bancorp "*emphasizes safety and soundness*" in its balance sheet and that underwriting in its REBL portfolio purportedly involves "*review[ing] prospective borrowers' previous rehabilitation experience in addition to overall financial wherewithal*." Specifically, the press release reported the following, in relevant part:

*In the second quarter of 2024, the Company initiated its measured entry into consumer fintech lending, by which the Company makes consumer loans with the marketing and servicing assistance of its existing and planned new fintech relationships.* While the $72.4 million of such loans at June 30, 2024 did not significantly impact income during the quarter, such lending is expected to meaningfully impact both the balance sheet and income in the future. We expect that impact will be reflected in a lower cost of funds for related deposits and increased transaction fees.

 **Highlights**

- The Bancorp reported net income of $53.7 million, or $1.05 per diluted share ("EPS"), for the quarter ended June 30, 2024, compared to net income of $49.0 million, or $0.89 per diluted share, for the quarter ended June 30, 2023, or an EPS increase of 18%. While net income increased 10% between these periods, outstanding shares were decreased as a result of common share repurchases which were significantly increased in 2024.

\*                    \*                    \*

-*The Bancorp emphasizes safety and soundness and its balance sheet has a risk profile enhanced by the special nature of the collateral supporting its loan niches,*

***related underwriting, and the characteristics of its funding sources, including those highlighted in the bullets below.*** Those loan niches and funding sources have contributed to increased earnings levels, even during periods in which markets have experienced various economic stresses.

*    *    *

- In its real estate bridge lending portfolio, The Bancorp has minimal exposure to non-multifamily commercial real estate such as office buildings, and instead has a portfolio largely comprised of rehabilitation bridge loans for apartment buildings. These loans generally have three year terms with two one-year extensions to allow for the rehabilitation work to be completed and rentals stabilized for an extended period, before being refinanced at lower rates through U.S. Government Sponsored Entities or other lenders. The rehabilitation real estate lending portfolio consists primarily of workforce housing, which we consider to be working class apartments at more affordable rental rates. Related collateral values should accordingly be more stable than higher rent properties, even in stressed economies. While the macro-economic environment has challenged the multifamily bridge space, ***the stability of The Bancorp's rehabilitation bridge loan portfolio is evidenced by the estimated values of underlying collateral.*** The Bancorp's $2.1 billion apartment bridge lending portfolio at June 30, 2024 has a weighted average origination date "as is" LTV of 70%, based on third party appraisals.  Further, the weighted average origination date "as stabilized" LTV, which measures the estimated value of the apartments after the rehabilitation is complete may provide even greater protection.

- ***As part of the underwriting process, The Bancorp reviews borrowers' previous rehabilitation experience in addition to overall financial wherewithal. These transactions also include significant borrower equity contributions with required performance metrics.*** Underwriting generally includes, but is not limited to, assessment of local market information relating to vacancy and rental rates, review of post rehabilitation rental rate assumptions against geo-specific affordability indices, negative news and lien searches, visitations by bank personnel and/or designated engineers, and other information sources.

33. On August 9, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on Form 10-Q filed with the SEC, affirming the previously reported financial results ("2Q24 10-Q"). The report claimed the Company's purported provision and allowance for credit losses procedures involved, in part, "review[ing] the adequacy of our ACL on at least a quarterly basis to determine a provision for credit losses to maintain our ACL at a level we believe is appropriate to recognize current expected credit losses."  Specifically, the quarterly report stated the following, in relevant part:

*Provision for Credit Losses*

Our provision for credit losses was $1.5 million for the second quarter of 2024 compared to a provision of $428,000 for the second quarter of 2023. The ACL was $28.6 million, or 0.51% of total loans, at June 30, 2024, compared to $27.4 million, or 0.51% of total loans, at December 31, 2023. The provision reflected continuing higher leasing net charge-offs, primarily in long haul and local trucking, transportation and related activities for which total exposure was approximately $34 million at June 30, 2024. We believe that our ACL is appropriate and supportable.

*          *          *

*Allowance for Credit Losses*

We review the adequacy of our ACL on at least a quarterly basis to determine a provision for credit losses to maintain our ACL at a level we believe is appropriate to recognize current expected credit losses. Our Chief Credit Officer oversees the loan review department, which measures the adequacy of the ACL independently of loan production officers. For detailed information on the ACL methodology, see "Note 6. Loans" to the unaudited consolidated financial statements herein.

At June 30, 2024, the ACL amounted to $28.6 million, which represented a $1.2 million increase compared to the $27.4 million ACL at December 31, 2023. The increase reflected the impact of higher leasing net charge-offs.

34.    The 2Q24 10-Q report further stated the purported value of the Company's fintech loans in the quarter:

The Company analyzes credit risk prior to making loans on an individual loan basis. The Company considers relevant aspects of the borrowers' financial position and cash flow, past borrower performance, management's knowledge of market conditions, collateral and the ratio of loan amounts to estimated collateral value in making its credit determinations. For SBLOC, the Company relies on the market value of the underlying securities collateral as adjusted by margin requirements, generally 50% for equities and 80% for investment grade securities. For IBLOC, the Company relies on the cash value of insurance policy collateral. ***Of the total $70.1 million of consumer fintech loans at June 30, 2024, $53.3 million consisted of secured credit card loans which the Bank makes with the marketing and servicing assistance of third parties.*** The majority of the balances were collateralized with deposits at the Bank, with related income statement impact reflected both in a lower cost of funds and fee income. The lower cost of funds results from balances required to be maintained to collateralize related card use.

35.    The 2Q24 10-Q report claimed that the Company maintained "disclosure controls and procedures were effective at a reasonable level of assurance as of June 30, 2024."

36.    The above statements identified in ¶¶ 29-35 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Bancorp had underrepresented the significant risk of default or loss on its REBL loan portfolio; (2) that the Company's current expected credit loss methodology was insufficient to account for the provision and/or allowance of credit losses; (3) that, as a result of the foregoing, the Company was reasonably likely to increase its provision for credit losses; (4) that there were material weakness in its internal control over financial reporting; (5) that its financial statements had not been approved by its independent auditor; (6) that, as a result of the foregoing, the Company's financial statements could not be relied upon; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

37.    The truth continued to emerge on October 24, 2024, after the market closed, when the Company announced its third quarter 2024 financial results in a press release for the period ended September 30, 2024, reporting net income of only $51.5 million. The Company attributed the results in part, to "a new CECL [current expected credit losses methodology] factor" to the Company's analysis of REBL loans classified as either special mention or substandard, "which increased the provision for credit losses and resulted in an after-tax reduction in net income of $1.5 million." The Company further explained its results also reflected "prior period interest income reversals on real estate bridge loans transferred to nonaccrual or modified," which "resulted in an

after-tax reduction in net income of $1.2 million." Specifically, the press release stated, in relevant part:

> Net income for the third quarter of 2024 amounted to $51.5 million.
>
> **Factors Helpful to Understand Third Quarter Net Income**
>
> 1.     *As explained under recent developments below, a new CECL factor was added which increased the provision for credit losses and resulted in an after-tax reduction in net income of $1.5 million.*
>
> 2.     *Prior period interest income reversals on real estate bridge loans transferred to nonaccrual or modified, resulted in an after-tax reduction in net income of $1.2 million.*
>
> 3.     A loss resulting from a transaction processing delay increased non-interest expense and resulted in an after-tax reduction in net income of approximately $900,000.
>
> \*                    \*                    \*
>
> *While real estate bridge loans classified as either special mention or substandard increased during the quarter, we believe that such classifications are at or near their peak. That conclusion is based, at least in part, on an independent review of a significant portion of the REBL portfolio performed during the third quarter by a firm specializing in such analysis.* Additionally, the 50 basis point Federal Reserve rate reduction may provide immediate cash flow benefits to borrowers, while the further declining forward yield curve should support further liquidity benefits, as fixed rates decline. Moreover, respective weighted average "as is" and "as stabilized" loan-to-values ratios ("LTVs") of 77% and 68%, respectively, based upon appraisals in the past twelve months, continue to provide significant protection against loss. Underlying property values as supported by such independent LTVs, continue to facilitate the recapitalization of certain loans from borrowers experiencing cash flow issues, to borrowers with greater financial capacity. *At September 30, 2024, real estate bridge loans classified as special mention and substandard respectively amounted to $84.4 million and $155.4 million compared to $96.0 million and $80.4 million at June 30, 2024. Each classified loan was evaluated for a potential increase in the allowance for credit losses ("ACL") on the basis of the aforementioned third-party appraisals of apartment building collateral.* On the basis of "as is" and "as stabilized" LTVs, increases to the allowance were not required. The current allowance for credit losses for REBL, is primarily based upon historical industry losses for multi-family loans, in the absence of significant charge-offs within the Company's REBL portfolio. *However, as noted in our second quarter press release, as a result of increasing amounts of loans classified as special mention and substandard, the Company evaluated potential related sensitivity for REBL in the third quarter.*

Such evaluation is inherently subjective as it requires material estimates that may be susceptible to change as more information becomes available. ***As a result, the Company added the aforementioned new qualitative factor to its quarterly ACL with a cumulative after-tax impact of approximately $1.5 million ($2.0 million pre-tax).***

**Highlights**

- The Bancorp reported net income of $51.5 million, or $1.04 per diluted share ("EPS"), for the quarter ended September 30, 2024, compared to net income of $50.1 million, or $0.92 per diluted share, for the quarter ended September 30, 2023, or an EPS increase of 13%. While net income increased 3% between these periods, outstanding shares were decreased as a result of common share repurchases, which significantly increased in 2024.

38.     The October 24, 2024 press release touted the "stability of the Company's REBL portfolio" and claimed Bancorp ***"saw strong growth in the third quarter across [its] Fintech Solutions activities with a robust pipeline."*** The press release stated, in relevant part:

- In its REBL portfolio, the Company has minimal exposure to non-multifamily commercial real estate such as office buildings, and instead has a portfolio largely comprised of rehabilitation bridge loans for apartment buildings. These loans generally have three-year terms with two one-year extensions to allow for the rehabilitation work to be completed and rentals stabilized for an extended period, before being refinanced at lower rates through U.S. Government Sponsored Entities or other lenders. The REBL portfolio consists primarily of workforce housing, which we consider to be working class apartments at more affordable rental rates. Related collateral values should accordingly be more stable than higher rent properties, even in stressed economies. While the macro-economic environment has challenged the multifamily bridge space, ***the stability of the Company's REBL portfolio is evidenced by the estimated values of the underlying collateral. The Company's $2.2 billion apartment bridge lending portfolio at September 30, 2024,*** has a weighted average origination date "as is" loan-to-value ratio of 70%, based on third-party appraisals. Further, the weighted average origination date "as stabilized" LTV, which measures the estimated value of the apartments after the rehabilitation is complete may provide even greater protection.

- As part of the underwriting process, The Bancorp reviews prospective borrowers' previous rehabilitation experience in addition to overall financial wherewithal. These transactions also include significant borrower equity contributions with required performance metrics. Underwriting generally includes, but is not limited to, assessment of local market information relating to vacancy and rental rates, review of post rehabilitation rental rate assumptions against geo-specific affordability indices, negative news searches, lien searches, visitations by bank personnel and/or designated engineers, and other information sources.

25

\*                    \*                    \*

*"We saw strong growth in the third quarter across our Fintech Solutions activities with a robust pipeline"*, said Damian Kozlowski, CEO of The Bancorp. "We expect this growth to support an increase in profitability in 2025 and continued gains in EPS.["]

39.    On this news, the Company's share price fell $7.95, or 14.47%, to close at $47.01 per share on October 25, 2024, on unusually heavy trading volume.

40.    On November 7, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on Form 10-Q filed with the SEC, affirming the previously reported financial results (the "3Q24 10-Q"). The report claimed the Company's purported provision and allowance for credit losses procedures involved, in part, "*review[ing] the adequacy of our ACL on at least a quarterly basis to determine a provision for credit losses to maintain our ACL at a level we believe is appropriate to recognize current expected credit losses*." Specifically, the quarterly report stated the following, in relevant part:

*Provision for Credit Losses*

Our provision for credit losses was $3.5 million for the third quarter of 2024 compared to a provision of $1.8 million for the third quarter of 2023. The ACL was $31.0 million, or 0.52% of total loans, at September 30, 2024, compared to $27.4 million, or 0.51% of total loans, at December 31, 2023. As a result of a new qualitative factor for classified REBL loans, the provision for credit losses was increased by $2.0 million in the third quarter of 2024. The provision also reflected the impact of continuing higher leasing net charge-offs, especially in long haul and local trucking, transportation and related activities for which total exposure was approximately $34 million at September 30, 2024. We believe that our ACL is appropriate and supportable.

\*                    \*                    \*

*Allowance* for *Credit Losses*

*We review the adequacy of our ACL on at least a quarterly basis to determine a provision for credit losses to maintain our ACL at a level we believe is appropriate to recognize current expected credit losses.* Our Chief Credit Officer oversees the loan review department, which measures the adequacy of the ACL independently

26

of loan production officers. For detailed information on the ACL methodology, see "Note 6. Loans" to the unaudited consolidated financial statements herein.

At September 30, 2024, the ACL amounted to $31.0 million, which represented a $3.6 million increase compared to the $27.4 million ACL at December 31, 2023. The increase reflected the impact of a new qualitative factor for classified REBL loans, as the provision for credit losses was accordingly increased by $2.0 million in the third quarter of 2024. The increase also reflected the impact of higher leasing net charge-offs.

41.    The 3Q24 10-Q report further stated the purported value of the Company's fintech loans in the quarter.

The Company analyzes credit risk prior to making loans on an individual loan basis. The Company considers relevant aspects of the borrowers' financial position and cash flow, past borrower performance, management's knowledge of market conditions, collateral and the ratio of loan amounts to estimated collateral value in making its credit determinations. For SBLOC, the Company relies on the market value of the underlying securities collateral as adjusted by margin requirements, generally 50% for equities and 80% for investment grade securities. For IBLOC, the Company relies on the cash value of insurance policy collateral. ***Of the total $280.1 million of consumer fintech loans at September 30, 2024, $111.0 million consisted of secured credit card loans, with the balance consisting of other short-term extensions of credit.*** Consumers do not pay interest on the majority of consumer fintech loan balances, including secured credit card loans. The majority of the income on those loans is reflected in non-interest income under "Consumer credit fintech fees" and originate with the marketers and servicers for those loans. The secured credit card balances were collateralized with deposits at the Bank, with related income statement impact reflected both in a lower cost of funds and fee income.

*                    *                    *

42.    The 3Q24 10-Q report claimed that the Company maintained "disclosure controls and procedures were effective at a reasonable level of assurance as of September 30, 2024."

43.    On January 30, 2025, the Company announced its fourth quarter and full year 2024 financial results in a press release for the period ended December 31, 2024.  Among other things, the press release purported to reassure investors that Bancorp "***emphasizes safety and soundness***" in its balance sheet and that underwriting in its REBL portfolio purportedly involves "***review[ing] prospective borrowers' previous rehabilitation experience in addition to overall financial***

*wherewithal*." The press release further touted that the Company was a "**y*ear of significant Fintech business expansion and earnings per share growth of 23%.***" Specifically, the press release reported the following, in relevant part:

Highlights

- The Bancorp reported net income of $55.9 million, or $1.15 per diluted share ("EPS"), for the quarter ended December 31, 2024, compared to net income of $44.0 million, or $0.81 per diluted share, for the quarter ended December 31, 2023, or an EPS increase of 42%. While net income increased 27% between these periods, outstanding shares were reduced as a result of repurchases, which were significantly increased in 2024.

*         *         *

- Gross dollar volume ("GDV"), representing the total amounts spent on prepaid and debit cards, increased $6.36 billion, or 19%, to $39.66 billion for the quarter ended December 31, 2024, compared to the quarter ended December 31, 2023. The increase reflected continued organic growth with existing partners and the impact of clients added within the past year. Total prepaid, debit card, ACH, and other payment fees increased 16% to $29.2 million for the fourth quarter of 2024 compared to the fourth quarter of 2023. ***Consumer credit fintech fees amounted to $3.0 million for the fourth quarter 2024, as a result of our initial entry into credit sponsorship in 2024.***

*         *         *

- ***The Bancorp emphasizes safety and soundness and its balance sheet has a risk profile enhanced by the special nature of the collateral supporting its loan niches, related underwriting, and the characteristics of its funding sources,*** including those highlighted in the bullets below. Those loan niches and funding sources have contributed to increased earnings levels, even during periods in which markets have experienced various economic stresses.

*         *         *

- In its REBL portfolio, the Company has minimal exposure to non-multifamily commercial real estate such as office buildings, and instead has a portfolio largely comprised of rehabilitation bridge loans for apartment buildings. These loans generally have three-year terms with two one-year extensions to allow for the rehabilitation work to be completed and rentals stabilized for an extended period, before being refinanced at lower rates through U.S. Government Sponsored Entities or other lenders. The REBL portfolio consists primarily of workforce housing, which we consider to be working class apartments at more affordable rental rates. Related collateral values should accordingly be more stable than higher rent

28

properties, even in stressed economies. ***While the macro-economic environment has challenged the multifamily bridge space, the stability of the Company's REBL portfolio is evidenced by the estimated values of the underlying collateral. The Company's $2.1 billion apartment bridge lending portfolio at December 31, 2024***, has a weighted average origination date "as is" loan-to-value ratio of 70%, based on third-party appraisals. Further, the weighted average origination date "as stabilized" LTV, which measures the estimated value of the apartments after the rehabilitation is complete may provide even greater protection.

- As part of the underwriting process, The Bancorp reviews prospective borrowers' previous rehabilitation experience in addition to overall financial wherewithal. These transactions also include significant borrower equity contributions with required performance metrics. Underwriting generally includes, but is not limited to, assessment of local market information relating to vacancy and rental rates, review of post rehabilitation rental rate assumptions against geo-specific affordability indices, negative news searches, lien searches, visitations by bank personnel and/or designated engineers, and other information sources.

*       *       *

***"2024 was another year of significant Fintech business expansion and earnings per share growth of 23%", said Damian Kozlowski, President and CEO of The Bancorp.*** "Led by the growth in our Fintech solutions group, we are affirming 2025 guidance of $5.25 a share. The guidance does not include $150 million share of planned buybacks in 2025, or $37.5 million per quarter. Planned buybacks have been reduced $100 million in 2025 from 2024 to facilitate the repayment of $96 million of senior secured debt."

44.    On March 3, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "FY24 10-K"). The FY24 10-K touted the Company's results of operations, including the Company's provision for credit losses on loans, as follows in relevant part:

**Results of Operations**

Overview

Net interest income continued its upward trend in 2024, increasing $22.2 million to $376.2 million in 2024 from $354.1 million in 2023. The increase reflected the impact of the higher interest rate environment on loans and growth in certain loan categories, partially offset by the impact of lower balances for SBLOCs and IBLOCs, and commercial loans, at fair value which are in runoff. At December 31, 2024, our total loans, including commercial loans, at fair value, amounted to $6.34 billion, an increase of $642.8 million, or 11.3%, over the $5.69 billion

balance at December 31, 2023. Our investment securities available-for-sale increased $755.3 million to $1.50 billion from $747.5 million between those respective dates reflecting $900 million of fixed rate securities purchases in April, 2024. Those securities purchases were made to reduce exposure to lower rate environments. The provision for credit losses on non-consumer fintech loans increased $854,000 to $9.3 million in 2024, reflecting the $2.0 million impact of a new qualitative factor for classified REBL loans in the third quarter of 2024. The provision also reflected the impact of continuing higher leasing net charge-offs. Please see "Results of Operations-Provision for Credit Losses on Loans" below.

A $34.4 million increase in non-interest income in 2024 compared to 2023 reflected $19.6 million of consumer fintech loan credit enhancement income, which correlated to a like amount for provision for credit loss for consumer fintech loans. It also reflected an $8.0 million increase in prepaid, debit card and related fees and increased ACH, card and other payment processing fees.

*     *     *

*Provision for Credit Losses on Loans*

Our provision for credit losses on non-consumer fintech loans was $9.3 million for 2024 and $8.5 million for 2023. Provisions are based on our evaluation of the adequacy of our ACL, particularly in light of the estimated impact of charge-offs and the potential impact of current economic conditions which might impact our borrowers. The increased provision in 2024 over 2023 reflected a new qualitative factor for classified REBL loans, which resulted in a $2.0 million increase in the provision in the third quarter of 2024. The provision in both years also reflected the impact of continuing higher leasing net charge-offs, especially in long haul and local trucking, transportation and related activities for which total exposure was approximately $32 million at December 31, 2024. For additional related information see "Note E—Loans" to the audited consolidated financial statements herein. At December 31, 2024, our ACL amounted to $31.9 million, or 0.52%, of total loans. We believe that our allowance is appropriate and supportable in providing for current and future expected losses, consistent with CECL guidance. For more information about our provision and ACL and our loss experience see *"—Financial Condition—Allowance for Credit Losses"* and *"—Summary of Loan and Lease Loss Experience,"* below.

*     *     *

We determine our allowance for credit losses with the objective of maintaining an allowance level we believe to be sufficient to absorb our estimated current and future expected credit losses. We base our determination of the adequacy of the allowance on periodic evaluations of our loan portfolio and other relevant factors. However, this evaluation is inherently subjective as it requires material estimates, including, among others, expected default probabilities, the amount of loss we may incur on a defaulted loan, expected commitment usage, the amounts and timing of

expected future cash flows, collateral values and historical loss experience. We also evaluate economic conditions and uncertainties in estimating losses and other risks in our loan portfolio. To the extent actual outcomes differ from our estimates, we may need additional provisions for credit losses. Any such additional provisions for credit losses will be a direct charge to our earnings. We utilize a CECL model to determine the adequacy of the allowance and inputs include net charge-off history and estimated loan lives. The allowance for credit losses is accordingly sensitive to changes in these inputs, such that related increases would increase the allowance and provision

45.     The FY24 10-K also reported the Company's financial statements for the fiscal years ended December 31, 2022 through 2024, which were purportedly approved by the Company's auditor, Crowe LLP. Specifically, the FY24 10-K represented the following audit opinion:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of The Bancorp, Inc. and Subsidiaries (the "Company") as of December 31, 2024, the related consolidated statements of operations, comprehensive income, shareholders' equity, and cash flows for the year ended December 31, 2024, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2024, and the results of its operations and its cash flows for the year ended December 31, 2024, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2024, based on criteria established in Internal Control – Integrated Framework: (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated March 3, 2025 expressed an unqualified opinion.

46.     The FY24 10-K further reported the following concerning the Company's "***Evaluation of Disclosure Controls and Procedures***" including that the Company's "Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at a reasonable level of assurance as of December 31, 2024."

47.    The above statements identified in ¶¶ 37-38, 40-46 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.    Specifically, Defendants failed to disclose to investors: (1) that Bancorp had underrepresented the significant risk of default or loss on its REBL loan portfolio; (2) that the Company's current expected credit loss methodology was insufficient to account for the provision and/or allowance of credit losses; (3) that, as a result of the foregoing, the Company was reasonably likely to increase its provision for credit losses; (4) that there were material weakness in its internal control over financial reporting; (5) that its financial statements had not been approved by its independent auditor; (6) that, as a result of the foregoing, the Company's financial statements could not be relied upon; and (7) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

48.    On March 4, 2025, after the market closed, Bancorp issued a press release which disclosed that the Company had "inappropriately filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2024" and the financial statements from 2022 to 2024 should no longer be relied upon. The Company explained that its auditors for those years "did not provide approval to include [the] audit opinion . . . or [the] consent to the incorporation by reference of their audit report in certain registration statements." The Company further revealed it is "working expeditiously to perform and complete additional closing procedures related to accounting for consumer fintech loans in the allowance for credit losses" in order to file an amended Annual Report. The Company revealed it " is evaluating the impact of this non-reliance on its conclusions regarding disclosure controls and procedures and internal control over financial reporting." Specifically, the press release stated as follows, in relevant part:

**Item 4.02.     Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

(a)    On March 3, 2025, The Bancorp, Inc. (the "Company") inappropriately filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "Annual Report"). After receiving notification on March 3, 2025 from the Company's independent public accounting firm, Crowe LLP, on March 4, 2025, the Audit Committee of the Board of Directors concluded that ***the Company's filed financial statements for the fiscal years ended December 31, 2022 through 2024 as shown in the Annual Report, should no longer be relied upon because the Company's independent public accounting firm, Crowe LLP, did not provide final approval to include the audit opinion with respect to the fiscal year ended December 31, 2024 and the consent to the incorporation by reference of the audit report in certain registration statements that were included with the Annual Report. Further, the Company's prior independent public accounting firm, Grant Thornton LLP, also did not provide approval to include its audit opinion with respect to the fiscal years ended December 31, 2023 and 2022, or its consent to the incorporation by reference of their audit report in certain registration statements, in the Annual Report. The Company is working expeditiously to perform and complete additional closing procedures related to accounting for consumer fintech loans in the allowance for credit losses and to file an amended Annual Report on Form 10-K/A to issue its financial statements for the fiscal years ended December 31, 2022 through 2024 to include Crowe's and Grant Thornton LLP's audit opinions and related consents***.

The Company is evaluating the impact of this non-reliance on its conclusions regarding disclosure controls and procedures and internal control over financial reporting.

The Audit Committee discussed this matter with Crowe LLP and Grant Thornton LLP.

49.    On the same date, the Company filed a Form NT 10-K with the SEC, disclosing the

Company would be unable to file its fiscal year 2024 annual report due to the foregoing issues,

stating as follows in relevant part:

The Bancorp, Inc. (the "Company") will be unable to file its Annual Report on Form 10-K for the year ended December 31, 2024 (the "Annual Report") within the prescribed time period without unreasonable effort or expense. As disclosed in a Form 8-K filed on March 4, 2025, the Company inappropriately filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "Annual Report") on March 3, 2025. The Company's independent public accounting firm, Crowe LLP, did not provide final approval to include the audit opinion with respect to the fiscal year ended December 31, 2024 and the consent to the incorporation by reference of the audit report in certain registration statements that was included with

the Annual Report filed on March 3, 2025. Further, the Company's prior independent public accounting firm, Grant Thornton LLP, also did not provide approval to include its audit opinion with respect to the fiscal years ended December 31, 2023 and 2022, or its consent to the incorporation by reference of their audit report in certain registration statements, in the Annual Report. The Company is unable to file the Annual Report in a timely manner without unreasonable effort or expense because it needs to perform and complete additional closing procedures related to accounting for consumer fintech loans in the allowance for credit losses.

50.     On this news, the Company's share price fell $2.34, or 4.38%, to close at $51.25 per share on March 5, 2025, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Bancorp securities between January 25, 2024 and March 4, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

52.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bancorp's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Bancorp shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Bancorp or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

54.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Bancorp; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

57.     The market for Bancorp's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Bancorp's securities traded at artificially inflated prices during the Class Period.

Plaintiff and other members of the Class purchased or otherwise acquired Bancorp's securities relying upon the integrity of the market price of the Company's securities and market information relating to Bancorp, and have been damaged thereby.

58.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Bancorp's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Bancorp's business, operations, and prospects as alleged herein.

59.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bancorp's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

60.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

61.    During the Class Period, Plaintiff and the Class purchased Bancorp's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

62.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bancorp, their control over, and/or receipt and/or modification of Bancorp's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bancorp, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

63.    The market for Bancorp's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Bancorp's securities traded at artificially inflated prices during the Class Period.  On February 5, 2025, the Company's share price closed at a Class Period high of $62.75 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities

relying upon the integrity of the market price of Bancorp's securities and market information relating to Bancorp, and have been damaged thereby.

64.    During the Class Period, the artificial inflation of Bancorp's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bancorp's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Bancorp and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

65.    At all relevant times, the market for Bancorp's securities was an efficient market for the following reasons, among others:

(a)    Bancorp shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Bancorp filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Bancorp regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Bancorp was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

66.    As a result of the foregoing, the market for Bancorp's securities promptly digested current information regarding Bancorp from all publicly available sources and reflected such information in Bancorp's share price. Under these circumstances, all purchasers of Bancorp's securities during the Class Period suffered similar injury through their purchase of Bancorp's securities at artificially inflated prices and a presumption of reliance applies.

67.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

68.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bancorp who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

69.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Bancorp's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

71.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Bancorp's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

72.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bancorp's financial well-being and prospects, as specified herein.

73.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bancorp's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bancorp and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

74.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or

reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

75.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bancorp's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bancorp's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that

was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Bancorp's securities during the Class Period at artificially high prices and were damaged thereby.

77.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Bancorp was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Bancorp securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

78.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<u>**SECOND CLAIM**</u>

**Violation of Section 20(a) of The Exchange Act**

<u>**Against the Individual Defendants**</u>

80.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

81.     Individual Defendants acted as controlling persons of Bancorp within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the

SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     As set forth above, Bancorp and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:   March 14, 2025

/s/ Ryan M. Ernst
**BIELLI & KLAUDER, LLC**
Ryan M. Ernst (ID No. 4788)
1204 N. King Street
Wilmington, DE  19801
Tel.: (302) 803-4600
rernst@bk-legal.com

**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email: rdawson@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Counsel for Plaintiff Nathan Linden*