# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Individually and On Behalf of All Others Similarly Situated,<br><br><br>Plaintiff,<br><br><br><br>vs.<br><br>THE BANCORP, INC., DAMIAN M. KOZLOWSKI, and PAUL FRENKIEL,<br><br><br>Defendants. | No.: 1:25-cv-00326-JLH-LDH<br><br>Hon. Judge Jennifer L. Hall<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATON OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE ............................................................................ 7

PARTIES…………………………… .................................................................. 8

CHRONOLOGY OF FACTS RELATED TO THE BANCORP'S REAL ESTATE BRIDGE LOANS………………….. ............................................................................... 9

DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS ................... 49

LOSS CAUSATION ........................................................................................ 55

CLASS ACTION ALLEGATIONS ..................................................................... 59

APPLICABILITY OF PRESUMPTION OF RELIANCE ......................................... 61

NO SAFE HARBOR ....................................................................................... 62

CAUSES OF ACTION .................................................................................... 63

PRAYER FOR RELIEF ................................................................................... 65

JURY TRIAL DEMANDED ............................................................................. 66

## **GLOSSARY OF TERMS**

| | |
|---|---|
| ACL | Allowance for Credit Losses. |
| CECL | Current Expected Credit Loss, the methodology that the Bancorp used to determine ACL. |
| Classified | Classified loans refer to loans with identified weaknesses, indicating a distinct possibility of loss. |
| Criticized | Criticized loans refer more broadly to loans exhibiting potential weaknesses and possibility of loss. |
| LTV | Loan-to-value ratio, the ratio of the loan amount to the appraised value of the asset used as collateral. |
| Non-accrual | Non-accrual loans are loans that have stopped generating interest income due to non-payment. |
| NPA or NPL | Non-performing assets or non-performing loans are those where the borrower has missed required payments. The Bancorp considered loans to be non-performing if they are on a non-accrual basis or they are past due 90 days or more and still accruing interest. The Bancorp's Nonperforming Loans are comprised of nonaccrual loans and loans past due 90 days or more still accruing interest. |
| OREO | Other Real Estate Owned. |
| REO | Real Estate Owned. |
| Special mention | Special mention loans refer to loans with weaknesses that may, if not cured, threaten the borrower's future repayment ability. |
| Substandard | Substandard loans refer to loans with an existing weakness indicating the possible inadequacy of net worth and other repayment sources. |

Lead Plaintiff Southeastern Pennsylvania Transportation Authority (SPTA), individually and on behalf of all other persons and entities similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Bancorp, Inc., analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and entities that purchased the common stock of the Bancorp between January 26, 2024 and March 25, 2025, inclusive (the "Class Period").[1] Plaintiff pursues claims against the Bancorp Inc., its Chief Executive Officer Damian M. Kozlowski ("Kozlowski"), and its Chief Financial Officer Paul Frenkiel ("Frenkiel") (collectively, "Defendants"), under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      The Bancorp is a financial holding company that generates the majority of its revenue and income through its primary wholly owned subsidiary, The Bancorp Bank, National

---

[1] Excluded from the Class are: (a) persons or entities who suffered no compensable losses; (b) Defendants; the present and former officers and directors of Bancorp at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns; and (c) any entity that any person excluded under subsection (b) controlled or has or had a material ownership interest at any time.

Association (the "Bank").[2] Among other leasing and lending activities, the Bancorp engages in commercial real estate bridge lending ("REBL"). The Company's commercial real estate bridge loans are primarily collateralized by adjustable-rate, three-year loans on multifamily apartment buildings, particularly in the Sunbelt, and, more particularly, in Texas.

3.      In 2023, news of the bursting bubble in multifamily real estate was everywhere. From the Wall Street Journal to real estate trade publications to local Texas outlets, the news was awash in reports of the dramatic rise in the value of multifamily apartment buildings that had taken hold in the historically low-interest rate environment of the COVID-19 pandemic but that had recently come crashing back to earth.

4.      The story revolved around the Sunbelt and, more specifically, Texas.

5.      More specifically still, the story centered on the legion of small-time real estate syndicators (also known as sponsors), many with no background in finance or real estate, who embarked on the same business model during this boom: pooling small investments to purchase apartment buildings with plans to upgrade the units, raise rents and then flip them for a profit after as little as three years.

6.      As syndicators raced to snap up apartment buildings, many followed the same playbook, as publicized by the guru of Texas multifamily syndication, the real estate coach, social media celebrity and viral financial influencer (or "finfluencer"), Brad Sumrok.

7.      As the Wall Street Journal later explained in a feature article on Sumrok: Sumrok "sold a map to the American dream. The route was simple: Raise money, take out loans and buy a multifamily rental building. Make cosmetic repairs and raise rents as high as the market will bear."

---

[2] Throughout this Complaint, the Bancorp and the Bank are collectively referred to as simply the "Bancorp" or the "Company".

The article continued: "More than any single salesman, Sumrok drove the business known as apartment syndication to new heights. From his base in Dallas, he spawned a generation of landlords who now own tens of thousands of apartment buildings that have a collective worth in the billions of dollars."[3]

8.      That article reported the incredible statistic that syndication accounted for more than 80% of sales of low-end apartment buildings during the pandemic in some Sunbelt cities, according to brokers on the ground, and opined that the syndicators pushed prices of rental buildings to new highs, as they were often willing to pay more than traditional real estate investors.

9.      These syndicators were riding high during the pandemic-era environment of low interest rates and historic growth in property values, however, their fortunes reversed quickly when interest rates began to climb around 2023.

10.      Many were unable to rent the units or flip the buildings as planned, and the viral and in-vogue Sumrokian business model was hammered by two simultaneous economic shocks: Inflation made the necessary repairs more expensive to complete and, at the same time, the rising interest rates greatly increased the cost of servicing the debts taken on the properties.

11.      Syndicators in the Sunbelt and Texas were hit particularly hard, and the result was a highly-publicized wave of defaults and foreclosures in real estate bridge loans across Texas in general and Houston in particular. This wave received a great deal of attention, in the Wall Street Journal particularly, which ran a number of feature stories on a student of Sumrok – a former I.T.

---

[3] "Investors Keep Faith in America's 'Apartment King,' Even in Tough Times," *The Wall Street Journal*, July 15, 2024, https://www.wsj.com/real-estate/investors-apartments-syndicates-sumrok-f77c8f5c?msockid=072541f098e9623608585279998b6334.

professional-turned-pandemic-era real estate syndicator – who lost five Houston-area apartment complexes, comprising well over 3,000 apartments, to foreclosure in mid to late 2023.

12.      In that context, the Bancorp held its fourth quarter 2023 investor conference call on January 26, 2024. When asked a question concerning the recent "pain" observed in the REBL industry, Defendant Kozlowski denied that the Bancorp is affected, stating: "***Now you hear a lot of these stories in the market but those aren't our type of deals. Those aren't with our type of structures in the markets that we inhabit with the type of developers that we have. So we haven't seen the same stress that you might have read about in other areas.***"

13.      Defendant Kozlowski conveyed to investors that, because the Bancorp is "***very strict in the underwriting,***" the Bancorp's loan portfolio is more secure than the stories one hears in the news about the troubled REBL loans elsewhere in  market. He stated "***we do have some deferments. This is very natural, though… No, we don't believe any substantial risk of default and loss***" and further reported that "***we're not seeing anything abnormal yet from ours.***" This was materially false and misleading, for multiple reasons.

14.      A few months later, in March of 2024, an explosive short seller report (the "Report") would pull back the curtain on these loans and show the Bancorp's REBL loans to be of shockingly poor quality, not as described in Defendants' public statements, and carrying such a high risk of default and loss that the Bancorp's reserves were woefully inadequate.

15.      Once the Report identified the loans in the Bancorp's REBL book, it became clear that the syndicators the Bancorp was underwriting were not more secure than the inexperienced ones making headlines for incurring reckless amounts of debt to upgrade units and flip buildings in the image of viral finfluencers like Brad Sumrok but, in fact, fit that description to a tee.

16.      What Defendants told investors was false, and Defendants knew it.

17.     On January 26, 2024, at the time Defendant Kozlowski told investors, *inter alia*, that he sees no "***substantial risk of default***" and that he is "***not seeing anything abnormal yet***" in the REBL book, events that the Defendants themselves would later characterize as a "shock" and a "wave" tied to the 2021 and 2022 vintage of REBL loans had already occurred.

18.     In fact, while Defendant Kozlowski told investors he sees no "***substantial risk of default***" on January 26, 2024, a $39.4 million loan collateralized by a Houston apartment complex – which the Report would later identify as "Case Study 1" and describe as a paradigmatic example of just the type of headline-grabbing problem loan that Defendants denied having on the books at all – ***had already stopped making payments as of December 2023*** and was heading rapidly toward default, which would happen ***less than 42 days later***.

19.     In addition, as to the "deferments" Defendant Kozlowski assured investors were "***very natural, though***", it would later be revealed that this referred to an apartment complex in New Jersey – which the Report would publicly identify as "Case Study 2" – that was condemned by the authorities in August 2023 and then sustained a major fire that sent fifteen people to the hospital in December, 2023, and had not been repaired at the time the Report's authors had the complex photographed in March of 2024. This was not "very natural." Investors had no idea.

20.     As mentioned, no more than 42 days after Kozlowski told investors there was no "***substantial risk of default***," the Houston apartment complex identified as Case Study 1, which is called the Aubrey, defaulted. The Bancorp bought it back at a foreclosure sale on April 2, 2024.

21.     A few weeks later, the Bancorp received the latest official appraisal of the Aubrey from the Harris Central Appraisal District. The appraisal, dated April 19, 2024, stated that, by law, the Appraisal District must appraise property at market value and that, as of January 1, 2024, the

appraised value was $39,236,366. This was sharply down from the previous year's appraised value of $51,439,333.

22.    Yet even though the Defendants had in their possession an updated appraisal that valued the Aubrey at $39,236,366 as of January 1, 2024, Defendants continued to tell investors throughout the Class Period that "the $39.4 million loan balance compares to a September 2023 third party 'as is' appraisal of $47.8 million, or an 82% 'as is' LTV," and, accordingly assured them that loss is not indicated on the property.

23.    But if Defendants had disclosed the appraisal they received on the property as of January 1, 2024, the LTV would have been over 100%. In other words, it would have revealed that, despite what Defendants told investors over and over on investor calls and SEC filings during the Class Period – for example, Defendant Frenkiel assured: "***Well, the $39.4 million is the big one. And we've been discussing that. And you have all the information, I think, that we have to ascertain that there is not loss indicated in that property***" – loss ***was*** indicated on the property.

24.    Touting the earlier September 2023 appraisal to give investors confidence, while concealing the updated and much lower January 2024 appraisal, was materially misleading to investors, and it overstated the likelihood that the Bancorp would be able to sell the Aubrey without loss—something that Defendants announced they had arranged in mid-2024 and was due to close by the end of the year.

25.    Throughout the Class Period, the risks concealed by Defendants but identified in the Report materialized, and the Bancorp's substandard REBL loans – including those which the Report identified as Case Study 1 and Case Study 2, respectively, and documented their shocking conditions in graphic detail – continued to swell and weigh on the Bancorp's financial results. Moreover, the risk concealed by Defendants' continued use of the inflated appraisal of the Aubrey

materialized. While Defendants repeatedly told investors they were selling the Aubrey and would move that property off the books without loss, the Aubrey sale never happened. The Bancorp continues to own the Aubrey to this day.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the price of the Bancorp's common stock, Plaintiff and other Class members have suffered significant losses.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

29.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

30.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

31.    Lead Plaintiff SPTA purchased the Bancorp common stock at artificially inflated prices during the Class Period, as set forth in the previously filed Certification (Dkt. No. 13-2), and suffered damages as a result of the conduct alleged herein.

32.    Defendant Bancorp is incorporated under the laws of Delaware with its principal executive offices located in Wilmington, Delaware. Bancorp's common stock trades on the NASDAQ exchange under the symbol "TBBK."

33.    Defendant Damian M. Kozlowski ("Kozlowski") was the Company's Chief Executive Officer ("CEO") at all relevant times.

34.    Defendant Paul Frenkiel ("Frenkiel") was the Company's Chief Financial Officer ("CFO") at all relevant times.

35.    Defendants Kozlowski and Frenkiel (together, "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, portfolio managers and institutional investors. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## CHRONOLOGY OF FACTS RELATED TO THE BANCORP'S REAL ESTATE BRIDGE LOANS

I.      *The Bancorp and its Business*

36.      The Bancorp is a financial holding company that, through its wholly owned subsidiary, The Bank, engages in institutional banking, commercial real estate bridge lending, small business lending and commercial fleet leasing. The vast majority of revenue and income is generated through the Bank.

37.      In the second half of 2021, the Bancorp began originating commercial real estate bridge loans (REBLs) to hold on its balance sheet, primarily to multi-family apartment buildings located in the Sunbelt, with a particular focus on Texas.[4]

38.      The Bancorp described these apartment loans as "transitional commercial mortgage loans to improve and rehabilitate existing properties that already have cash flow."

39.      The loans generally have three year terms, and the vast majority are variable interest rate, with monthly interest rate adjustments.

40.      The Bancorp's real estate bridge loans do not have recourse to the borrower and, accordingly, depend on cash reserves and cash generated by the underlying properties for repayment.

41.      Because repayment of the loans depends on the sponsor's ongoing ability to service the debt, the Bancorp's underwriting process and selection of sponsors and projects were critical to the success of the REBL portfolio.

---

[4] The Bancorp had previously originated commercial real estate loans for sale into securitizations but not to retain on its balance sheet.

42.    According to Bancorp's 2024 10-K, which summarized the Company's real estate loans by state, there were nearly four times as many loans located in Texas as any other state, with Florida and Georgia ranking as a distant second and third, respectively.

43.    Moreover, the 2024 10-K further reported that, of the Bancorp's eight largest real estate loans (all of which are multi-family apartment buildings), six are located in Texas.

II.    *Highly-Publicized Cracks Emerge Following the Pandemic-Era, Multifamily Syndication Boom*

44.    Throughout 2023, observers of the real estate industry began to sound the alarm over the health of the multifamily real estate syndication boom that had taken off like wildfire during the historically low interest-rate environment of the COVID-19 pandemic. The epicenter of this boom was the Sunbelt and, more specifically, Texas.

45.    For instance, the Wall Street Journal ran an article on April 4, 2023 entitled: *Apartment-Building Sales Drop 74%, the Most in 14 Years*, with the subheading: *Interest-rate increases and banking upheaval push down demand for multifamily buildings*.[5] The article reported that "the recent drop in building sales follows a stretch of record-setting transactions that peaked in late 2021, when the multifamily sector was a top performer in commercial real estate. Cash-rich investors had a strong appetite for apartment buildings. Their top choices were in Sunbelt cities such as Dallas, Phoenix and Tampa, Fla., where rental housing is largely unregulated and rents were rising 20% or more annually until last year."

46.    As the article explained, multifamily apartment buildings had been the favored target for real estate syndicators during the boom years. The multifamily sector had long been considered a relatively safe investment, and this was especially true with home prices rising so

---

[5] Will Parker, "Apartment-Building Sales Drop 74%, the Most in 14 Years," *The Wall Street Journal*, April 4, 2023, https://www.wsj.com/articles/apartment-building-sales-drop-74-the-most-in-14-years-9a80aa48?msockid=072541f098e9623608585279998b6334.

much during the pandemic that they forced many to keep renting. Yet despite the perceived safety of the multifamily sector, real estate analytics firm Green Street estimated that, by April of 2023, apartment building values had fallen more than 20% from their peak. Cities across the Sunbelt were hit particularly hard.

47.     The Wall Street Journal article reported that the collapse of the multifamily market posed a threat for real estate syndicators in particular, as well as the small and regional banks that underwrite the projects: "Many real-estate owners had ramped up their multifamily businesses when borrowing costs were much lower, enacting business plans that called for raising rents before selling properties to pay out investors… The recent troubles hitting regional banks are also a blow to the sector. These lenders became the second-largest source of multifamily loans last year, after government-agency-backed loans[.]"

48.     The article warned of an upcoming wave of defaults in these loans: "[T]here is one type of sale most everyone expects more of: forced sales. A number of investors bought buildings in recent years with short-term, floating-rate debt. Because of rising interest rates, those loans cost a lot more to pay down than they did when the building owners first borrowed the money."

49.     The article concluded ominously: "The remaining balance of many floating-rate loans will come due this year, and borrowers whose buildings aren't bringing in enough cash every month might have to sell their buildings to pay off their debts. 'We're in the very early stages,' [president of the multifamily arm of commercial real estate brokerage firm] said."

50.     Just a few days later, the Wall Street Journal ran an article entitled *Houston Apartment Owner Loses 3,200 Units to Foreclosure as Multifamily Feels the Heat*, with the

subheading: *Building values are falling, interest rates are rising and rent growth is slowing*, which reported on the weaknesses surfacing in the multifamily market in Houston, Texas, in particular.[6]

51.    This article described the recent distress suffered by a real estate syndicator, Applesway Investment Group, which had borrowed nearly $230 million during the pandemic to finance the purchase of apartment buildings in Houston, writing: "Applesway was typical of commercial-property investors who saw big profits in the prospect of acquiring moderately priced buildings and raising rents after making certain improvements. Chief Executive Jay Gajavelli said in a video posted online that he could double his investors' money by sprucing up a lower-income apartment complex located outside central Houston, with a plan to raise rents and charge tenants extra fees for amenities."

---

[6] Will Parker and Konrad Putzier, "Houston Apartment Owner Loses 3,200 Units to Foreclosure as Multifamily Feels the Heat," *The Wall Street Journal*, April 11, 2023, https://www.wsj.com/articles/houston-apartment-owner-loses-3-200-units-to-foreclosure-as-multifamily-feels-the-heat-fb3d0e75?msockid=072541f098e9623608585279998b6334.



A screenshot example of Jay Gajavelli, a budding financial influencer, or "finfluencer."

52.     The Wall Street Journal article continued, however, that "[m]ost of Applesway's loans originated in the second half of 2021, just before the Federal Reserve began its campaign to raise interest rates. At one property, the interest rate on Applesway's loan had risen from 3.4% to around 8%, according to loan information obtained from data firm Trepp Inc. At least two of the properties were financed with about 80% debt, which is considered high leverage in commercial real estate."

53.     The article reported: "Now, the recent increase in interest rates has cooled off the apartment sector. Investors who bought properties at the peak of the market in 2021 often financed those deals with floating-rate mortgages. Many of those loans have reset at higher rates."

54.    It concluded: "Foreclosures such as that of Applesway in Houston are rare, but they could become more common as loans come due and hedging contracts that protect landlords from rising interest rates start to expire."

55.    The following month, in a May 23, 2023 article entitled: *A Housing Bust Comes For Thousands of Small-Time Investors*,[7] the Wall Street Journal cast a more detailed light on the multifamily housing crunch roiling the Sunbelt, providing more color on the rise and fall of firms like Applesway.

56.    The article provided an in-depth profile of Applesway's CEO, Jay Gajavelli, as indicative of the boom-and-bust trajectory of a certain type of Texas real estate syndicator.

57.    It explained how Gajavelli was a former information-technology worker turned real estate syndicator who had, over the past four years, cobbled together a "real-estate empire using funds from dozens of small investors who wanted a chance to earn a landlord's riches without any of the work. He pitched double-your-money returns in ebullient, can-do talks at investor conferences and on YouTube videos."

58.    Gajavelli was just one in an army of real estate syndicators (also known as sponsors), many with no background in finance or real estate, who pooled small investments to purchase apartment buildings with plans to upgrade the units, raise rents and then flip for a profit after as little as three years.

59.    The syndicators favored apartment complexes in the South and Southwest where real estate prices were relatively low, rents were rising, and housing rules tended to be more permissive. Many of these locations had few or no renter protections, making it easier to evict

---

[7] Will Parker, Konrad Putzier and Shane Shifflett, "A Housing Bust Comes For Thousands of Small-Time Investors," *The Wall Street Journal*, May 23, 2023, https://www.wsj.com/real-estate/a-housing-bust-comes-for-thousands-of-small-time-investors-3934beb3.

tenants and hike up rents. These syndicators typically relied on floating interest-rate loans that, at the height of the market in 2021, offered initial rates around 3.5%.

60.     Like scores of Texas real estate syndicators, Gajavelli followed the playbook of Texas syndicator guru and real estate investing coach Brad Sumrok, known as "The Apartment King."

61.     Brad "Apartment King" Sumrok offered workshops and real estate training programs to thousands of aspiring syndicators prior to and during the pandemic, charging fees as high as $35,000 a year for membership in his real estate investing clubs.

62.     Sumrok is a rarefied social media celebrity and finfluencer who drives a Ferrari with the vanity license plate "APT KING," according to his social media posts. His website, bradsumrok.com/blog, calls him the Tony Robbins of multifamily investing, likening Sumrok to the prominent life and business coach known for his high-energy workshops and seminars.

63.     "Just love collecting rent from 9,716 miles away," Sumrok said in one post. "Invest in apartments and make money while you travel." His online testimonials feature middle-age people who had quit 9-to-5 jobs and, with Sumrok's help, became millionaires purchasing "doors," investor lingo for apartment units.



An    example    of    Brad    Sumrok's    finfluencer    materials,    taken    from    his    website, bradsumrok.com/blog.

64.    In a  2021 recruitment video posted on YouTube, for instance, Sumrok led a packed auditorium through what he calls a "Millionaire Multifamily Incantation."

65.    As cinematic string music blared, Sumrok lifted his fist, initiating a call-and-response incantation in which the crowd told itself, *inter alia*,: "I am a millionaire apartment investor! I am financially free! My cash flow pays for my lifestyle! I pay zero in taxes!"



A    screenshot    of    Sumrok    leading    the    Millionaire    Multifamily    Incantation, https://www.youtube.com/live/PpRPFHz-pEk?t=12796s.

66.     As the Wall Street Journal reported, Gajavelli belonged to one of Sumrok's clubs, called the "Millionaire Multifamily Mastermind." Like scores of others, Gajavelli fashioned himself and his deals in the image of the Apartment King.

67.     Gajavelli and similar syndicators were riding high during the pandemic era environment when the syndication market was awash in cheap capital, snapping up multifamily apartment buildings in bidding wars and pushing property prices to records highs.

68.     But when interest rates began to rise in 2023, the apartment sector cooled rapidly. These loans re-set to higher interest rates at the same time that the growth in rents subsided, squeezing syndicators and threatening their ability to keep up with the loans. Making things worse,

rising inflation made the necessary repairs more expensive, throwing a wrench into the heart of the syndicators' business model.

69.     As for those who had forked over their money to Gajavelli and similar syndicators, the Wall Street Journal lamented that "these investors were, in fact, highly vulnerable to interest-rate increases over the past year that crushed the business model they and thousands of others in similar deals across the U.S. had hoped would make them wealthy. For them and a host of small investors —who were expecting a share of rents and a piece of the profit in an eventual sale—it is looking like a looming investment-property disaster."

70.     And a looming disaster for syndicator investors means a looming disaster for syndicator lenders. The Wall Street Journal further warned: "Many [syndicators] have come under similar financial pressures and hold properties they can no longer afford. From 2020 through 2022, real estate syndicators reported raising at least $115 billion from investors, according to a Wall Street Journal analysis of Securities and Exchange Commission filings. So far, defaults have been rare. But real-estate analysts and property investors anticipate a wave of foreclosures ahead."

71.     Finally, the article quoted the principal of a Sunbelt property manager who, describing the many syndicators facing rising interest rates and dwindling rental payments, remarked: "The bubble is going to start popping if these guys can't get out of these deals in time."

72.     This drumbeat continued to grow. On August 7, 2023, the Wall Street Journal ran an article entitled: *A Real-Estate Haven Turns Perilous with Roughly $1 Trillion Coming Due*, with the subheading: *Apartment buildings rose in value for years, but surging interest rates loom over sector's property owners now*.[8]    The    article    reported    that    "the

---

[8] Konrad Putzier and Will Parker, "A Real-Estate Haven Turns Perilous with Roughly $1 Trillion Coming Due," August 7, 2023, *The Wall Street Journal*, https://www.wsj.com/real-estate/a-real-

18

the sudden surge in debt costs last year now threatens to wipe out many multifamily owners across the country. Apartment-building values fell 14% for the year ended in June after rising 25% the previous year, according to data company CoStar."

73.    The article continued that: "Mortgage delinquencies in the multifamily category are low but increasing. Borrowing costs have doubled, rent growth is slowing and building expenses are rising. Data provider Trepp earlier this year identified one type of rental-apartment debt as accounting for a large share of the commercial mortgages at risk of default."

74.    The article warned in apocalyptic terms: "Apartment landlords face a 'hydrogen-bomb scenario,' said Peter Sotoloff, a veteran real-estate finance executive, a former founding member of Blackstone's property debt business and former managing partner at Mack Real Estate Credit Strategies."

75.    It further observed that: "A new crop of private real-estate firms, funded mostly by floating-rate debt and small-investor cash, have become bigger competitors in the multifamily market. Some paid higher prices based on rosy expectations of steep rent increases for years to come. Now, they are having trouble making the numbers work."

76.    Meanwhile, the fate of Applesway and Houston's greater multifamily syndication market continued to deteriorate. On August 8, 2023, commercial real estate outlet BisNow ran a story on its Houston homepage entitled: *Applesway Loses Fifth Apartment Complex to Foreclosure, Property Sold For $50M at Auction*.[9] The article reported that Applesway had lost

---

estate-haven-turns-perilous-with-roughly-1-trillion-coming-due-74d20528?msockid=072541f098e9623608585279998b6334.

[9] Maddy McCarty, "Applesway Loses Fifth Apartment Complex to Foreclosure, Property Sold For $50M at Auction," *BisNow*, August 8, 2023, https://www.bisnow.com/houston/news/multifamily/applesway-loses-fifth-apartment-complex-to-foreclosure-property-sold-for-50m-at-auction-120136.

another Houston-area apartment building to foreclosure, the fifth in four months, observing: "Although Gajavelli hasn't spoken publicly, he appears to be a victim of floating-rate debt and the Federal Reserve's interest rate increases starting in early 2022."

77.    The article continued: "In Houston, apartment owners that utilized floating-rate debt could be in for a lot of trouble, Todd Marix, senior managing director of investment sales at Berkadia's Houston office, previously told *BisNow*. Serious distress is likely to be more prevalent for workforce or Class-C housing owners, he said. 'That's usually the first shoe to fall within a deteriorating  situation,' Marix said. 'These buildings are older; they require more capital expenditure.' That was the case for Applesway, which touted a portfolio of workforce housing with 'value-add potential' on its website, which has been taken down for maintenance."

78.    As the multifamily market continued to unravel, it became increasingly clear that the viral business model touted by The Apartment King had led many Texas syndicators astray, leaving workforce and Class-C housing complexes deep in debt.

79.    On October 3, 2023, real estate news outlet the Real Deal chronicled the cracks that had started to show in the holdings of the "Apartment King" himself.[10] The Real Deal reported: "Two years ago, when the multifamily market was on fire, [Sumrok] disciples' deal volume surged by $1.5 billion as national multifamily investment smashed records. Sumrok would regularly parade star pupils onstage who'd banked stunning returns, according to some students. Over the past six months, that success story has unraveled. This spring, Sumrok alum Jay Gajavelli lost millions of dollars of investors' money after buildings bought through his Applesway Investment

---

[10] Suzannah Cavanaugh and Isabella Farr, "Multifamily mentor Brad Sumrok built an empire. Now, the cracks are showing." *The Real Deal*, October 3, 2023, https://therealdeal.com/magazine/national-october-2023/multifamily-mentor-brad-sumrok-built-an-empire-now-the-cracks-are-showing/.

Group fell into foreclosure. The Wall Street Journal characterized the blowup as one of the largest commercial real estate disasters since the 2008 financial crisis."

80.     The article continued: "Multiple deals are now bleeding cash, some of which Sumrok invested in personally, according to Morningstar data and two students familiar with the matter. Others have already tanked, thanks to market conditions: rising construction costs that stymied value-add plans, soaring interest rates and slipping rent growth."

81.     Notably, the article reported that the "distress has descended on a new breed of buyer — small-time investors who shelled out thousands of dollars to learn the trade from so-called multifamily gurus."

82.     The article delved into the "Sumrok Multifamily Mentoring playbook," and how it has led novice syndicators into the deep end, explaining: "The Sumrok Multifamily Mentoring playbook is getting novices to syndicate deals. Through multifamily syndication, a sponsor or general partner finds an apartment building, secures financing, then taps a number of investors or limited partners to help fund the deal. Sumrok teaches how to be a sponsor, a limited partner or both."

83.     Moreover, "[i]n his lectures, Sumrok paints apartments as the most fruitful investment. Sponsors have control over valuation, he says. They can raise rents, make repairs and ultimately boost their profits. 'Multifamily is different. It's completely independent of what's happening in the markets," Sumrok explains in a video on his website."

84.     But given the highly publicized decline of the multifamily market, "some Sumrok students, eyeing those distressed deals, lay the blame on their mentor's teaching. They claim the guru and his coaches advised students they could borrow with floating-rate debt when financing tightened, and reviewed deals underwritten for outsized rent growth as the market turned."

85.    As 2023 wound down, the pain in the Texas multifamily syndication market, especially Houston's, intensified. On November 11, 2023, BisNow ran an article entitled: *Lender Moves to Foreclose on Stafford Apartment Complex After $288M Loan Default*, reporting that the "multifamily distress continues to make itself evident in Houston, with a Stafford apartment complex set to be sold at a Harris County foreclosure auction after the owner defaulted on a $288M loan, public records show."[11]

86.    The Houston complex at issue, the Retreat at Stafford, is "a 264-unit garden-style complex built in 2006," owned and operated by a Texas-based multifamily syndicator known as GVA Real Estate Group. The housing complex's website explained that GVA "specializes in conventional as well as affordable opportunities, paying particular attention to expanding sub-markets."

87.    Explaining that GVA's investment strategy entailed looking for distressed properties that could be fixed up and yield above-market cash flow once stabilized, the article noted that "[t]he Retreat at Stafford could add to a long and growing list of multifamily properties foreclosed upon in Harris County this year."

88.    The Real Deal covered that foreclosure as well, in an article entitled *Foreclosure auction scheduled for GVA-owned apartments near Houston*, which it ran on November 28, 2023.[12] That article began: "The spotlight on multifamily distress in Houston just got brighter, as

---

[11] Maddy McCarty, "Lender Moves to Foreclose on Stafford Apartment Complex After $288M Loan Default," BisNow, November 22, 2023, https://www.bisnow.com/houston/news/multifamily/lender-moves-to-foreclose-on-stafford-apartment-complex-after-288m-loan-default-121789.

[12] Quinn Donoghue, "Foreclosure auction scheduled for GVA-owned apartments near Houston," *The Real Deal*, November 28, 2023, https://therealdeal.com/texas/2023/11/28/foreclosure-looms-over-gva-owned-apartments-in-houston/.

a southwest suburban apartment complex is slated for a foreclosure auction early next month." It added: "GVA, which focuses on value-add multifamily investments, is swimming in debt. Earlier this month, it was reported that the firm was delinquent on two loans, totaling $55.6 million and connected to four apartment complexes."

89.     The same outlet provided more color on December 4, 2023, running a feature article entitled: *Syndicators are sinking. Who'll make it out alive?*, with the subheading: "*Rookie mistakes put struggling multifamily firms in deeper hole.*[13] Reflecting on the recent wave of foreclosures suffered by GVA, the article opined: "It was the usual script of syndication – pooling equity to buy property – gone wrong. [The GVA founder] had tapped floating-rate debt, then fallen into delinquency and default under crushing rate hikes."

90.     The article pointed out that many of the syndicators hit the hardest lacked experience, both in terms of years and deal value. "'A lot of people who are in trouble on multifamily syndicated deals, they were in high school in 2008," said Levi Benkert, who syndicates industrial deals as CEO of Harbor Capital and previously developed multifamily. 'They didn't think this could happen.' Insiders expect the distress hitting select syndicators to spread."

91.     "GVA is hardly alone," the article continued. Rockstar Capital, a Texas syndicator run by self-proclaimed "Apartment Rockstar" Robert Martinez, lost a Houston property in September after defaulting on a $51 million loan. And Think Multifamily, an investment firm and real estate education program founded by another former student of syndication guru Brad Sumrok, had lost a West Texas apartment building in September as well.

---

[13] Suzanne Cavanaugh and Isabella Farr, "Syndicators are sinking. Who'll make it out alive?," *The Real Deal*, December 4, 2023, https://therealdeal.com/magazine/national-december-2023/syndicators-are-sinking-wholl-make-it-out-alive/.

92.    The article warned: "More foreclosures are coming, according to Aaron Jodka, research director for [real estate services firm] Colliers' capital markets team."

93.    The pain went from bad to worse. Just two days later, The Real Deal ran another article, this one entitled: *GVA defaults on $125M in Austin loans*, with the subheading: *Multifamily syndicator faces string of losses across Texas*.[14] "Problems are mounting for multifamily syndicator GVA," wrote the article, adding that, just a month after defaulting on the $288 million in loans in Houston, the syndicator has defaulted on another $125 million in loans on two apartment complexes in Austin.

94.    "Across the Sun Belt and in cities across Texas, multifamily syndicates are beginning to lose their properties or negotiate workouts with lenders," the article reported.

95.    Finally, on January 24, 2024, the Real Deal ran a story entitled: *Multifamily guru Brad Sumrok slapped with fraud suit*, reporting on a lawsuit brought by a Texas doctor turned real estate syndicator, alleging that Sumrok had bilked him out of nearly $100,000 in worthless real estate investment courses.[15]

96.    Of the plaintiff's allegations that Sumrok had failed to follow through on the promise to provide mentorship and syndication opportunities, the article quipped: "In the end, Sumrok's alleged failure to introduce [plaintiff] to deals could shake out as a lucky break. Many syndicators, who often rely on value-add plans to achieve touted returns, have struggled to stay above water on deals they bought with floating rate debt."

---

[14] Joe Lovinger, "GVA defaults on $125M in Austin loans," *The Real Deal*, December 6, 2023, https://therealdeal.com/texas/austin/2023/12/06/gva-defaults-on-125m-in-austin-multifamily-loans/.

[15] Suzannah Cavanaugh, "Multifamily guru Brad Sumrok slapped with fraud suit," The Real Deal, January 24, 2024, https://therealdeal.com/national/2024/01/24/brad-sumrok-hit-with-fraud-allegations/.

III.   *In Response to Direct Questioning, Defendants Deny That They Are Affected By the "Pain" Observed in the REBL Market and Assure Investors that, Due to Strict Underwriting Standards, the Bancorp's REBL Loans are Different*

97.    On the Bancorp's fourth quarter 2023 earnings conference call, held on January 26, 2024, Defendants were asked a question concerning whether the cracks that had emerged in the multifamily syndication market were affecting the Bancorp's REBL business:

> Frank Schiraldi [Piper Sandler]: …***I know you got a lot of questions on the REBL loans. People look at that industry, they've seen some pain elsewhere away from you guys***. And you did see some migration into criticized and classified last quarter. Just wondering what you saw this quarter on that front. And then any change to your general thoughts on that paper?
>
> ***Defendant Kozlowski***: It's -- I think we have a more secure portfolio because there was a real lowering of cap rates and structure structurally in the multifamily market, things like subordinated debt, lower reserves, not buying the proper interest rate. We didn't do any of that. ***We are strict – we're very strict in the underwriting. We -- our portfolio has matured. So it's -- we do have some deferments. This is very natural, though. No write-offs. No, we don't believe any substantial risk of default and loss but as you mature that port, it's hard to know whether it's just a maturing portfolio where you have some people who have finished the projects or it's more based on the economy, it's not abnormal, we're not seeing anything abnormal yet from ours. Now you hear a lot of these stories in the market but those aren't our type of deals. Those aren't with our type of structures in the markets that we inhabit with the type of developers that we have. So we haven't seen the same stress that you might have read about in other areas.***

98.    The Bancorp released a year-end investor presentation on January 25, 2024. This presentation contained many of the themes that Defendant Kozlowski relayed to investors on the conference call, repeatedly touting the REBL loans as part of the Bancorp's "lower risk loan portfolio," and explaining that the real estate bridge loans were "comprised of workforce apartment buildings in carefully selected areas." In addition to reporting that $2.0 billion in REBL loans had been originated since 2021, all in apartment buildings, the presentation touted the Bancorp's "strong collateral" and referred to real estate bridge lending as a "lower historic credit loss niche."

99.     While the bursting of the multifamily syndication real estate bubble was common knowledge by this point (as evidenced by the many newspaper articles cited above and the analyst question referencing the pain elsewhere in the REBL market), investors emerged from the Bancorp's investor conference call and presentation believing that, while many multifamily projects and lenders were in trouble, the Bancorp's strict underwriting standards and its careful choice of which syndicators to lend to and which markets to deploy capital distinguished the Bancorp from these other REBL lenders.

IV.     *In its 2/29/24 10-K, Defendants Continue to Tout Their Underwriting Practices, But Hint of Trouble Ahead and Now Admit that One of the Bancorp's Largest Real Estate Bridge Loans Has Been Delinquent Since December 2023*

100.     On February 29, 2024, the Bancorp filed its annual report on Form 10-K (the "2024 10-K"). In it, the Bancorp provided more detail concerning its purportedly rigorous underwriting process.

101.     While the 2024 10-K warned generically that "low occupancy or rental rates may negatively impact loan repayment," it assured investors that: "because these loans were previously originated for sale, or because we may decide to sell certain REBL loans in the future, the underwriting and other criteria used were those which buyers in the capital markets indicated were most crucial when determining whether to buy the loans."

102.     The Bancorp further assured investors that: "The Company analyzes credit risk prior to making loans, on an individual loan basis. The Company considers relevant aspects of the borrowers' financial position and cash flow, past borrower performance, management's knowledge of market conditions, collateral and the ratio of the loan amount to estimated collateral value in making its credit determinations."

103.     In addition, the 2024 10-K delved further into how the Bancorp calculates its allowance for credit losses, or ACL, stating: "We review the adequacy of our ACL on at least a

quarterly basis to determine a provision for credit losses to maintain our allowance at a level we believe is appropriate to recognize current expected credit losses. Our Chief Credit Officer oversees the loan review department, which measures the adequacy of the ACL independently of loan production officers."

104.    It continued: "Management estimates the ACL quarterly, and… uses relevant internal and external historical loan performance information, current economic conditions, and reasonable and supportable forecasts. Historical credit loss experience provides the initial basis for the estimation of expected credit losses over the estimated remaining life of the loans. The methodology used in the estimation of the ACL, which is performed at least quarterly, is also designed to be responsive to changes in portfolio credit quality and the impact of current and future economic conditions on loan performance. The review of the appropriateness of the ACL is performed by the Chief Credit Officer and presented to the Audit Committee of the Board for their review."

105.    Contrasting with Defendant Kozlowski's upbeat assessment from the January 26, 2024 investor call that he saw no "substantial risk of default and loss" and "nothing abnormal," though, the 2024 10-K stated the following with respect to distressed loans: "Loans which are experiencing financial stress are reviewed by the loan review department, which is independent of the lending lines. The review includes an analysis for a potential specific reserve allocation in the ACL. For REBL, updated appraisals are generally obtained in conjunction with modifications. In the fourth quarter of 2023, an increasing trend in substandard loans was reflected in an increase in the risk level for the REBL ACL economic qualitative factor, which resulted in a $1.0 million increase in the fourth quarter provision for credit loss on loans."

106.    The 2024 10-K explained the substandard classification this way: "A substandard classification reflects an existing weakness indicating the possible inadequacy of net worth and other repayment sources. These classifications are used both by regulators and peers, as they have been correlated with an increased probability of credit losses. Increases in substandard loans do not necessarily require increased provisions for credit losses or allowance allocations on the basis of loan-to-value and other considerations based upon assessments by the loan review department which is independent of the lending lines."

107.    The referenced "increasing trend in substandard loans" in the fourth quarter of 2023 was documented in this chart, classifying the Bancorp's loans by year of origination:

| As of December 31, 2023 | 2023 | 2022 | 2021 | 2020 | 2019 | Prior | Revolving loans at amortized cost | Total |
|---|---|---|---|---|---|---|---|---|
| **Real estate bridge lending** | | | | | | | | |
| Pass | 397,073 | 1,013,199 | 461,474 | — | — | — | — | 1,871,746 |
| Special mention | — | 59,423 | 16,913 | — | — | — | — | 76,336 |
| Substandard | 12,300 | — | 39,400 | — | — | — | — | 51,700 |
| Total real estate bridge lending | 409,373 | 1,072,622 | 517,787 | — | — | — | — | 1,999,782 |

108.    As highlighted in red, the chart shows a $39.4 million REBL loan, originated in 2021, moving into substandard.

109.    The 2024 10-K described that $39.4 million REBL loan as "a $39.4 million REBL loan collateralized by an apartment complex in Texas, for which the borrower did not make December 2023, and January and February 2024 monthly interest-only payments as required under the related loan terms. Rehabilitation and related expenses exceeded initial estimates, further complicated by construction delays. Accordingly, management is considering its options to resolve this loan. While a September 2023 appraisal shows an as-is value which exceeds the loan balance plus currently estimated remaining construction costs and an as-if stabilized value exceeding $50.0 million, there can be no assurance that such amounts will ultimately be realized upon resolution."

110.    The market for Bancorp stock reacted negatively to the increasing trend in substandard loans, with share prices falling by 5% on March 4, 2024 and another 4% on March 5,

2024 on unusually heavy trading, with commentators linking the decline to the trouble in the REBL book revealed in the 2024 10-K.

111.    For instance, securities analyst firm Piper Sandler released an analyst report on March 5, 2024 on the Bancorp entitled: *10-K Filing Provides Incremental Detail on REBL Book*. The report began: "We believe weakness in shares yesterday reflect a delayed reaction to the bank's 10-K filing late last week coupled with investor hyper-focus on CRE [commercial real estate]. In the filing, TBBK disclosed two items of particular interest. First, the bank saw criticized balances in its REBL book increase from 5% to 6.4%. Secondly, the bank disclosed that one of its largest REBL loans on a Houston multifamily building has been delinquent since December."

112.    Piper Sandler pointed out that, considering the loan was delinquent since December and the fourth quarter 2023 conference call had been held on January 26, "we wish it had been addressed on the 4Q conference call."

113.    While Piper Sandler found the news negative, Piper Sandler opined that it did not find it surprising because Piper Sandler believed that this delinquent loan was one that had previously been identified as problematic and was already involved in litigation: "Further, this loan was already tagged as a problem issue, was already on criticized status, and it has previously been documented in the press that the borrower is suing TBBK for forcing mandated insurance on the building in question while seeking to negotiate lower coverage limits. All to say, the delinquency news should not be particularly surprising; though we wish it had been addressed on the 4Q conference call."

114.    But because Defendants' disclosures were so cryptic and inadequate, Piper Sandler was wrong. The loan involved in the litigation over mandated insurance coverage was Bancorp's loan to a Houston apartment complex named Del Mar, which was in the portfolio of a real estate

29

private equity firm known as Three Pillars Capital. *See Del Mar TIC I, LLC, v. The Bancorp Bank*, 23-cv-08999 (S.D.N.Y.). While the state of affairs outlined in the Del Mar lawsuit was far from pretty, that was not the mysterious delinquency that the Bancorp had concealed in the Q4 conference call and then disclosed (without naming it) in the 2024 10-K.

115.    This unnamed delinquency was an even more dire situation. It would come to light in the explosive short seller report published later in the month.

V.    *On 3/21/24, An Explosive Short Seller Report Identifies the Bancorp's Troubled REBL Loans, Revealing that They are Very Different Than Described*

116.    On March 21, 2024, Culper Research released a short seller report (the "Report") containing a deep dive into the loans comprising the Bancorp's REBL portfolio.

117.    The Report pulled back the curtain and found these loans to be of shockingly poor quality, not as described in the Defendants' public statements, and carrying such a high risk of default and loss that the Bancorp's reserves were woefully inadequate.

118.    The Report utilized liens, deeds, and local property records to piece together loans constituting half of the Company's loan value coming due that year, and it profiled eight of the Bancorp's loans as in-depth case studies of the problems that infected the Bancorp's REBL book.

119.    The Report's findings were corroborated by other facts uncovered in Plaintiff's investigation, and would also be corroborated later by Defendants' own words and SEC filings.

120.    The loans that the Report identifies as Case Study 1 and Case Study 2 merit special mention here.

*Case Study 1: The Aubrey*

121.    The Report publicly identified the $39.4 million delinquency as the Aubrey, a Houston-area apartment complex, and delved into it as Case Study 1. The Report revealed:

In October 2021, TBBK funded a $39.4 million loan to 2310 Crescent Park Drive, Houston, Texas – a 436-unit complex called The Aubrey. In November 2022, a 17-year-old was shot

and killed at the complex, and the victim's mother is currently suing the owners. A market-leading real estate data provider suggests that the complex is just 47% occupied, rendering agency refinancing a non-starter. **Despite CEO Kozlowski claiming on TBBK's Q4 2023 conference call that the Company had no substantial risk of default or loss on its REBL loans, footnotes to TBBK's Form 10-K filed just 4 weeks later disclosed that an unnamed borrower on a $39.4 million loan had not made required interest payments for the past 3 months…** Recent reviews of the complex are overwhelmingly negative, calling the units "*disgusting*", "*crawling with cockroaches*", and claiming that "*everything seems like it's falling apart."* The equity in the deal was financed by a syndicator, TruePointCapital, whose founder Kyle Jones spent his career in software sales before deciding in 2020 that his true calling was to become a real estate guru. TruePoint claims that it is "*reinventing the way you build wealth*" by generating "*reliable fixed returns*" in investments with "*reduced risk and greater reward*."

122.    The Report included numerous decrepit photographs of the complex, and corroborated the high vacancies in a March 2024 visit to the property.

123.    While Defendant Kozlowski had insisted on the 1/26/24 conference call that the Bancorp's REBL loans were – due to the Bancorp's strong underwriting practices – more secure than those feeling the pain elsewhere in the REBL industry that had just taken so much heat in the press for extending floating interest-rate loans to inexperienced syndicators incurring reckless amounts of debt and fashioning themselves in the image of viral finfluencers like Brad Sumrok, the Report revealed that, in fact, the Bancorp's REBL book fit that description to a tee.

124.    To that end, the Report identified the syndicator behind the delinquent Aubrey loan as a particularly blatant example of a budding finfluencer ill-prepared to manage millions in real estate:





125.    As to the Bancorp's purportedly rigorous underwriting procedures, this $39.4 million loan to TruePoint Capital LLC and Kyle Jones does not even pass the smell test. As the Report pointed out, according to Kyle Jones's LinkedIn profile, he was in software sales since graduating from college and worked at IBM until August 2020 even though, according to TruePoint Capital LLC's website, Kyle Jones founded it (or co-founded it, depending on where one looks on the website) in 2017.

126.    TruePoint Capital LLC purports to consist of a Houston-based team and a strategically composed portfolio of multifamily investments nationwide with specific focus on Sunbelt markets.

127.    While the TruePoint Capital LLC website states that the firm was "founded in 2017 by Kyle Jones," boasts "significant experience" and has benefitted a wide range of investors, "including institutional capital partners, family offices and high-net-worth individuals" with the expertise the firm brings to the market, the claim is misleading at best considering that Kyle Jones was working full time at IBM until August 2020.

128.    According to Kyle Jones's LinkedIn page, he also hosts a weekly podcast, featuring a range of motivational content.

129.    On the podcast, in an episode from August 16, 2023, Jones describes his time working at IBM, and striving become a senior vice president at the firm, which would have been great for financial reasons but would have dominated his life. He further explains that, toward the end of his time at IBM, he was supporting an overly demanding global team that was requiring his attention at all hours of the day, as Jones was responsible for geographies in far-flung time zones such as the Middle East and Africa.

130.    Jones explains how that draining experience pushed him away from trying to climb the corporate ladder and toward seeking an alternative livelihood in real estate investing, which he viewed at the time not as a viable career path but a side hustle while he climbed the corporate ladder. Once Jones started finding some success in real estate, he then "pushed all his chips in," and switched careers, apparently sometime in the second half of 2020.

131.    The upshot is that, while the TruePoint Capital website claims to have been founded in 2017, Kyle Jones only had about a year of experience focusing his attention on his nascent multifamily real estate business at the time the Bancorp extended him the $39.4 million loan in October of 2021.

132.    The Report concluded: "In short, we view many of these loans as being driven by syndicators with "get rich quick" dreams who believed that they could easily rehab units, fill them with tenants, increase rents, and cash out for quick "passive" returns. Yet we believe that for these properties, none of these things have happened: costs have skyrocketed, vacancies remain high, rents have remained relatively stagnant, and interest rates have more than doubled. As these loans come due, we believe that not only will many GP/LP stakes be wiped, but TBBK will face meaningful losses. To that end, TBBK's $4.7 million in reserves, at just 0.24% of its REBL book, are a total farce."

133.    Many other Bancorp-funded REBL projects highlighted in the Report were similar, consisting of unproven and ill-capitalized syndicator borrowers and decrepit (and even condemned) apartment complexes: "TBBK's book also appears rife with unsophisticated syndicator borrowers. Unlike corporate borrowers with dry powder and the temperament to "extend and pretend", syndicators tend to work on a deal-by-deal or fund by fund basis, and thus don't have much breathing room, in our view. **Our review of their marketing materials suggests investors have been coaxed by promises of generational wealth through passive income."**

*Case Study 2: 501 West 7th Street, Plainfield, New Jersey*

134.    As Case Study 2, the Report identified 501-515 West 7th Street, Plainfield, New Jersey, against which the Bancorp funded a $12.3 million loan in October of 2021.

135.    The Report revealed that: "In August 2023, the building was condemned after hundreds of code violations and resident complaints."

136.    According to a news article cited on page twelve of the Report, *Plainfield families evicted because of 'heartless and uncaring' landlord: mayor*: "Families living in two West 7th

Street apartment buildings are temporarily homeless after the structures were declared unfit for human habitation and tenants were given just 24 hours to vacate."[16]

137.    Photos included in the Report make it easy to see why the building was condemned by the authorities:



*Source: ABC 7 NY*

138.    The Report also detailed that, in December 2023, a major fire broke out in the complex, sending fifteen people to the hospital.

139.    According to an article cited in the Report:

The building had been inspected by the quality-of-life task force due to complaints after its neighbor, 501 West 7th St., was condemned in August. Both buildings are owned by the same landlord and had hundreds of code violations.

---

[16] Suzanne Russell, "Plainfield families evicted because of 'heartless and uncaring' landlord: mayor," *MyCentralJersey.com*, August 11, 2023, https://www.mycentraljersey.com/story/news/local/union-county/2023/08/10/plainfield-apartments-condemned/70559559007/; *see also* Mali Gruezo, "Residents Describe Deplorable Conditions, Abuse at 501 West 7th Street," *Tap Into Plainfield*, https://www.tapinto.net/towns/plainfield/sections/community-life/articles/residents-describe-deplorable-conditions-abuse-at-501-west-7th-street.

> After receiving complaints from residents, inspectors found gaping holes and leaking pipes in ceilings and walls and open sewer pipes in the condemned building. The 501 building was evacuated and closed but residents were allowed to stay in the 515 building[.]
>
> Many told Eyewitness News that the landlord had ignored their pleas for help in fixing the deplorable conditions for more than a year.[17]

140.    The Report documented the atrocious state of the complex as of March 2024, still showing the unrepaired damage from the fire that had broken out in December:

---

[17] WABC, "At least 15 hospitalized after fire at Plainfield apartment building with history of problems," *Eyewitness News*, December 5, 2023, https://abc7ny.com/post/plainfield-fire-inspection-west-7th-street/14140427/.






*Source: Culper Research property visit, March 2024*

141.    In addition to the Report's loan-by-loan analysis, the investigators behind the Report visited 21 Bancorp-funded properties, and spoke to former employees including a former REBL underwriter, as well as several of the Bancorp's syndicator borrowers.

142.    The former Bancorp employee, who worked in the REBL underwriting department, confirmed that the Company's REBL loans were far riskier than advertised, making the Company's reserves insufficient by an order of magnitude or more: "We also spoke with a former TBBK REBL underwriter who told us that they might expect TBBK's losses to be anywhere from 10x to 15x higher than the Company's actual reserves: *'When loans come due, there will be potential issues where the value's just not there ... they are going to have to put cash into the deal to make it work or they'll just give the keys back.'*"

143.    In response to the news uncovered in the Report, Bancorp's stock price plunged, losing over 10.15% of its value on March 21, 2024, on unusually heavy trading volume.

VI.    *After the Aubrey's Owner Defaults in Early March 2024, the Bancorp Buys the Aubrey at a Foreclosure Sale on April 2, 2024, and Receives the Latest Official Appraisal of the Property A Few Weeks Later*

144.    Less than 42 days after Defendant Kozlowski assured investors on January 26, 2024 that he did not believe there was "*any substantial risk of default and loss*" – *even though the owner of the Aubrey had already failed to make its December 2024 payment* – the owner of the Aubrey defaulted.

145.    On March 8, 2024, the Bancorp formally notified the holder of the Aubrey loan that a default had occurred, and requested that a substitute trustee foreclose on the lien.

146.    That notice was duly signed by Olek DeRowe as Executive Vice President of the Bancorp Bank:

### APPOINTMENT OF SUBSTITUTE TRUSTEE

**Date:** March 8, 2024

**Deed of Trust**

      Date:  October 8, 2021

      Grantor:  Aubrey 436 Holdings, LLC

      Trustee:  William Z. Fairbanks

      Substitute Trustee:  Richard Melamed,

      Substitute Trustee's Address:  Richard Melamed, P.O. Box 3130, Bellaire, Texas 77402;
           telephone (713) 884-0104

      Beneficiary:  The Bancorp Bank, National Association

      Recording information: Harris County Clerk's File No. RP-2021-585262

**Property:**   Being a 14.3260 acres (624,040 square feet) tract of land, more or less, situated in the H.K. Lewis Survey, Abstract 42, Harris County, Texas and being more particularly described by metes and bounds in Exhibit "A" attached.

A default as defined in the Note or in the Deed of Trust has occurred and remains uncured.

The Deed of Trust provides that Beneficiary may appoint Substitute Trustees. Beneficiary appoints Substitute Trustees named above to act under and by virtue of the Deed of Trust.

Beneficiary requests any of the Substitute Trustees to foreclose the lien of the Deed of Trust against the collateral pledged.

                    The Bancorp Bank , National Association

                    By: _____
                    Name: Olek DeRowe
                    Title: Executive Vice President

147.    On April 2, 2024, the Bancorp foreclosed on the Aubrey, purchasing the apartment complex at a foreclosure sale with no other bids.

148.    On April 19, 2024, the Chief Appraiser of the Harris Central Appraisal District sent the Bancorp the official Notice of the 2024 property appraisal for the Aubrey.

149.     The Notice, dated April 19, 2024, stated: "By law, we must appraise property at market value. Market value is the price for which it would have sold on January 1 in the open market."

150.     The Notice informed the Bancorp, as property owner, that the appraised value of the property as of January 1, 2024 was $39,236,366.

151.     This valuation was sharply down from the previous year's appraised valuation of the Aubrey, which had been $51,439,333.

VII.     *The Risks Identified in the Report Materialize During the Class Period*

**1.  The Company's 1Q2024 Results**

152.     On April 25, 2024, the Company released its earnings for the three months ended March 31, 2024.

153.     In this filing, the Company described its underwriting procedures this way:

- As part of the underwriting process, The Bancorp reviews borrowers' previous rehabilitation experience in addition to overall financial wherewithal. These transactions also include significant borrower equity contributions with required performance metrics. Underwriting generally includes, but is not limited to, assessment of local market information relating to vacancy and rental rates, review of post rehabilitation rental rate assumptions against geo-specific affordability indices, negative news and lien searches, visitations by bank personnel and/or designated engineers, and other information sources.

- Rehabilitation progress is monitored through ongoing draw requests and financial reporting covenants.  This generally allows for early identification of potential issues, and expedited action to address on a timely basis.

- Operations and ongoing loan evaluation are overseen by multiple levels of management, in addition to the real estate bridge lending team's experienced professional staff and third party consultants utilized during the underwriting and asset management process.  This oversight includes a separate loan committee specific to real estate bridge lending, which is comprised of seasoned and experienced lending professionals who do not directly report to anyone on the real estate bridge lending team.  There is also a separate loan review department, a surveillance committee and additional staff which evaluate potential losses under the current expected credit losses methodology ("CECL"), all of which similarly do not report to anyone on the real estate bridge lending team.

154.    Describing the Aubrey – where there had been a default in March and a foreclosure sale the first week of April – the Company made the following disclosure, appearing to allude to the default without using the word "default":

> In the first quarter of 2024, a $39.4 million apartment building rehabilitation bridge loan was transferred to nonaccrual status. On April 2, 2024 the same loan was transferred from nonaccrual status to other real estate owned. We intend to complete the improvements, which have already begun, on the underlying apartment building. During the time that improvements are being completed, the Company intends to have a property manager lease improved units as they become available, prior to the sale of the property. The $39.4 million loan balance compares to a September 2023 third party "as is" appraisal of $47.8 million, or an 82% "as is" LTV, with additional potential collateral value as construction progresses, and units are re-leased at stabilized rental rates.[18]

155.    On April 26, 2024, the Bancorp held its earnings call for the first quarter of 2024. Defendants made two important points on this call.

156.    *__First__*, when asked about the health of the REBL book, Defendant Kozlowki elaborated and admitted that the Bancorp's REBL book is, in fact, experiencing a systemic "wave" of trouble flowing from the 2021 and 2022 vintage REBL loans:

**David Feaster [Raymond James]:**

Could you maybe touch on the REBL book maybe more broadly? Are you anticipating more issues like this one [the Aubrey situation]? Are you hearing similar pressures from other borrowers and maybe just touch on how debt service and LTVs are broadly on this book and maybe what gives you confidence in the remainder of the portfolio?

**Defendant Kozlowski**

Okay. First, there was a bit of what I would characterize as a wave that you see in our numbers today and this was originated mostly from the '21 and '22 vintage of loans. So we started this. We've been in this business since 2016. We've had very good performance. We even issued securities. And what happened was there were a couple of shocks that happened. We had the big inflation shock and then we also had this interest rate shock.

---

[18] The Company issued the same disclosure in its next quarterly filing, on July 25, 2024, and a substantially similar disclosure in the quarterly filing after that, on October 24, 2024. All of these filings reiterated that, as of September 2023, the Aubrey had received a third party "as is" appraisal of $47.8 million.

Now, the inflation shock obviously for the business plans, that people doing these deals changed. How much they had to pay for the materials in order to go into upgrade these apartments… And then you had this interest rate shock… It was where if you got into trouble with your project because of the inflation shock, you had to raise more money… At the higher interest rate level, it became very expensive to add more capital to finish the project. So that's where we've been working with our borrowers in order to help them with their business plans…

157.    ___Second___, the Defendants spent a lot of time addressing the Aubrey in particular, with

Defendant Frenkiel stating in prepared remarks:

Non-performers increased during the quarter by $7 million for leasing and SBL, but mostly as a result of an apartment building loan for $39.4 million, which compares to September 23 independent as-is appraisal of $47.8 million or an 82% as-is LTV with additional potential collateral value as rehabilitation progresses and units are released at stabilized rental rates… Accordingly, even with higher interest rate environment and other stresses, we believe LTVs based upon third-party appraisals continue to provide significant protection against potential loss… We believe that underwriting requirements provide significant protection against loss as supported by LTV ratios based upon third-party appraisals.

158.    In the question-and-answer portion of the call, the very first question concerned the

Aubrey, which the analyst called "the Elephant in the Room."

**David Feaster [Raymond James]**

Maybe let's just start with the elephant in the room and touch on this REBL credit. It looks like you all took that into OREO this month and are planning to finish the rehab yourself. Could you maybe just talk about what led you to that decision rather than just selling it today, and any specifics that you can with this credit? What you need to do? The expenses, maybe that'll come from that? Just the timeline of when you think it can be stabilized and sold with no losses?

…

**Defendant Frenkiel**

Well, if you look at the LTV as-is, on which you would base potential losses, the value continues to be there. So that's why we're going to finish up the construction ourselves and preserve that value and actually potentially increase the value as the property gets stabilized.

42

159.    Later in the call, Defendants were again asked why, given the purported loan-to-value, Defendants do not believe they will be able to sell the Aubrey in the near term:

**Frank Schiraldi [Piper Sandler]**

Just curious, given the LTV on an as-is basis, why you don't think -- it doesn't sound like you believe that's the more likely scenario to sell in the near term before completing the improvements. If you could just kind of talk us through that a little bit?

**Defendant Frenkiel**

We go down all paths. So obviously things like this, we've done obviously loans since 2016. We've had virtually no issues that were similar to this. This happened because of the shocks that were experienced in 2021 and '22. And the markets are at a higher rate. So the buyers out there might not be as numerous as they were in the past, but definitely we go down all tracks. So there is interest in the assets that we have. And if we can affect a reasonable sale, we will. But we can't wait for that. We have to -- we want to protect the value of the property and monetize it as quickly as possible. And so in these situations when they do occur, you have to go very quickly to preserve the property, you get in there immediately and complete the work.

160.    When asked about the costs of the renovation, Defendant Frenkiel stated: "Yes. So we have a budget, a detailed budget, so we have the estimated cost. And in fact, even after those expenditures, the 82% loan-to-value will be preserved. So the costs, they get capitalized. There are some reserves available, so it won't be dollar-for-dollar. But as I said, the LTV will still be maintained."

161.    Finally, reiterating the sentiment when asked about the delinquencies in the REBL book, Defendant Frenkiel assured: "Well, the $39.4 million is the big one. And we've been discussing that. And you have all the information, I think, that we have to ascertain that there is not loss indicated in that property."

162.    The market reacted poorly. On the news that there was, in fact, a "wave" of distressed loans moving through the Bancorp's REBL book based on the 2021 and 2022 vintage, Bancorp stock dropped over 8% on April 26, 2024, on unusually heavy volume.

163.    Market reaction confirmed that the stock price decline was caused by this wave of nonperforming REBL assets. Piper Sandler wrote on April 25, 2024, that "a negative in the quarter was that NPA balances grew lq [last quarter] even after adjusting for the $39.4M REBL loan that had been telegraphed as migrating over," and further opined on April 26, 2024 that: "While the $39.4M REBL loan migrating into NPAs was expected, we also got the sense criticized/classified/delinquencies will see additional migration when the 10-Q is filed, albeit at a decelerated pace. We believe the lack of detail provided here on the call is a driver of share price underperformance."

**2.  The Company's 2Q2024 Results**

164.    On July 25, 2024, the Bancorp released its financial results for the second quarter of 2024. The first development listed in the accompanying press release was that the Company has "entered into a purchase and sale agreement for an apartment property acquired by The Bancorp Bank through foreclosure in connection with a real estate bridge lending ('REBL') loan."

165.    The press release added that, as of "June 30, 2024, the related $39.4 million balance, comprised the majority of our other real estate owned," and added that the sale was set to close by the end of the year.

166.    The report also stated that the Company will evaluate the sensitivity of the allowance for credit loans (ACL) that it uses for its REBL loans.

167.    In addition, the Company disclosed that another REBL loan – which received a deferment in the fourth quarter of 2023 – had also become delinquent, reporting that: "Borrowers for a $12.3 million apartment property real estate bridge loan which had a six month payment deferral granted in the fourth quarter of 2023 have not resumed payments, and are reflected in the 60-89 days past due column in the table above."

168.    While the Company did not name the loan at the time, the Company later identified it in its quarterly report released on January 30, 2025 as relating to an apartment complex in Plainfield, New Jersey.

169.    This is Case Study 2 from the Report (Case Study 1 being the Aubrey)—the building that had been condemned by the authorities, forcing many residents into homelessness.

170.    The Company held the quarterly investor conference call on July 26, 2024. The first question was again about the Aubrey, seeking an update on its sale. Defendant Kozlowski responded: "So first part is – it's on track. It's the property in Houston, and we should be pretty much finished with the work going through the summer to the close. And so the buyer is involved and has done due diligence on the property and is involved in the plan -- the executed plan. The trend in the book is really from that '21, '22 vintage. Once again, there's been stress because of the rise of interest rates and also the supply problems that were that happened during the pandemic."

171.    Investors and securities analysts were pleased by the news that the Bancorp had entered into an agreement to sell the Aubrey without loss. On July 25, 2024, in an analyst report entitled: *2Q24 First Look: Bancorp Announces Sale Agreement of OREO w/o Loss*, Piper Sandler wrote: "Most saliently, the bank announced it has an agreement in place to sell its large REBL OREO property at a price fully covering the loan with no loss to the bank. TBBK is not out of the woods on the REBL loan book, and classified balances continued to build, but the sale, if completed, should support the thesis that LTVs are generally such that Bancorp can work through any issues with minimal loss."

172.    Piper Sandler reiterated the upbeat sentiment in another report dated July 28, 2024, writing: "On [the OREO] front, it was certainly a positive to see a deal in place to sell the underlying building and move it off balance sheet without loss."

### 3.    The Company's 3Q2024 Results

173.    The Company released its quarterly results for the third quarter on October 24, 2024, disclosing a sharp uptick in distressed REBL loans: "At September 30, 2024, real estate bridge loans classified as special mention and substandard respectively amounted to $84.4 million and $155.4 million compared to $96.0 million and $80.4 million at June 30, 2024."

174.    The Company further stated: "as noted in our second quarter press release, as a result of increasing amounts of loans classified as special mention and substandard, the Company evaluated potential related sensitivity for REBL in the third quarter… As a result, the Company added the aforementioned new qualitative factor to its quarterly ACL with a cumulative after-tax impact of approximately $1.5 million ($2.0 million pre-tax)."

175.    Acknowledging the rising level of distressed loans, the Company stated: "While real estate bridge loans classified as either special mention or substandard increased during the quarter, we believe that such classifications are at or near their peak. That conclusion is based, at least in part, on an independent review of a significant portion of the REBL portfolio performed during the third quarter by a firm specializing in such analysis."

176.    In addition, the Company's third quarter results disclosed that the $12.3 million loan – the one relating to the condemned property in Plainfield, New Jersey – had now fallen into the non-accrual category.

177.    On the third quarter investor conference call, Defendant Kozlowski stated in prepared remarks that the Company's "substandard multifamily loan assets continue to be

elevated," centering around the 2021 and 2022 vintage, but reiterated the belief that the Company

is at or near the peak in substandard assets.

178.    In the question-and-answer portion of the call, Defendant Kozlowksi further

discussed the wave of distressed loans emanating from the 2021 and 2022 vintages:

**Frank Schiraldi [Piper Sandler]**

Okay. And then just lastly on that front, you talked in the release about the expectation, I think the wording was nearing peak in terms of criticized balances. And just trying to think through timing there, I mean, if it's late 2021, early 2022 vintage, these things come up three-year initial term, it would seem to me that maybe early 2025 would be a point you could expect maybe a peak in criticized? Or is it that the rates coming down here in the near-term have you feeling about -- better about maybe peak earlier than that? Just trying to think through that. Thanks.

**Defendant Kozlowski**

Yeah. So we really believe we're at or near peak, and that's why we had a third party come in to validate and look at all the loans and ensure that we weren't being too aggressive in downgrades, and that it was right where it should be at the standard of the market. We have a plan in place. We believe that we can reduce it in the next two quarters.

So we have identified properties working with the sponsors. We've modified certain loans, and we're looking to offload or have those loans financed. So we're hoping to make -- first of all, we think we're at the peak, near the peak. We think there won't be a lot more, and we think we can reduce that balance number on the substandard criticized and classified assets over the next two quarters.

179.    On this news, the Company's share price fell $7.95, or 14.47%, to close at $47.01

per share on October 25, 2024, on unusually heavy trading volume.

180.    Market reaction confirmed that the stock price decline was caused by the continued

deterioration of the Bancorp's REBL book, with Piper Sandler observing on October 25, 2024:

"Continued significant credit migration in REBL book. The book continues to show meaningful

credit migration. Criticized and classified balances were up another 30% lq (migration was similar

in 2Q) growing from 8.3% to 11.0% of the total book. We also saw significant migration within

categories from special mention into substandard. Mgmt noted in the release that based on its

Case 1:25-cv-00326-JLH-LDH    Document 26    Filed 12/22/25    Page 51 of 70 PageID #: 319

analysis as well as an independent third party review, it believes criticized balances are approaching or have already reached peak and sees considerable opportunity to reduce these levels over the next few quarters."

181.    Piper Sandler also lamented the new $12.3 million in nonaccrual: "Falling into nonaccrual in the quarter was a $12.3M REBL that was reported delinquent last quarter after a previous modification. We had been hopeful this would have instead been refied to a new borrower as we are seeing new capital coming into the business. The nonaccrual brought total NPLs to 52 bps of loans up from 34 bps lq."

182.    But amid Bancorp's rising levels of distressed loans, Piper Sandler's report did note one positive, writing: "The large $40M REBL OREO continues to have a sale agreement in place and mgmt noted this is on track to close by year-end. The sale price is expected to cover the current balance plus forecasted improvements. Moving this property without loss would be a big positive for shares."

### 4.  <u>The Sale that was Supposed to Move the Aubrey off the Books with No Loss Stalls</u>

183.    The much-heralded sale of the Aubrey, however, was not to be.

184.    On the morning of March 26, 2025, the Bancorp filed an 8-K, announcing that the transaction has been delayed, with the purchaser having the option for two additional extensions.

185.    Piper Sander published a report that day, entitled *Large OREO Sale Agreement Extended, Buyer Deposit Increased (Again)*: "In an 8K this morning TBBK announced another delay in the sale of its large OREO. As we wrote last week (see note here) a successful sale would have been another dagger for shorts. Obviously having a sale agreement in place to collect par is only helpful if it gets executed."

186.    The analyst report continued: "A sale would have made investors feel warm and fuzzy inside and now the uncertainty still lingers. While disappointing this is not the end of the world by any stretch but does kick the can down the road a bit."

187.    On this disappointing news, Bancorp stock price fell over 5% on March 26, 2025, on unusually heavy volume.

VIII.    *Post-Class Period Developments*

188.    The loan on the Plainfield, New Jersey apartment complex was not repaid pursuant to its terms. It was sold on January 2, 2025 for $12.5 million, barely allowing the Bancorp to recover its $12.3 million principal.

189.    On June 30, 2025, in an 8-K, the Bancorp announced that the sale of the Aubrey had been terminated.

190.    The Bancorp continues to own the Aubrey. Per the Company's third quarter 2025 investor conference call held on October 31, 2025, the Company has had to complete major construction on the property, including on the roofs and the foundations of the complex.

## DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS

I.    *Defendant Kozlowski Falsely Denies the Company is Affected by the Well-Documented Pain in the REBL Industry, Tells Investors He Does Not Believe There is Any Substantial Risk of Default and Loss, and Insists that He is Not Seeing Anything Abnormal in the REBL Book*

191.    The Class Period begins on January 26, 2024. On that day, Defendant Kozlowski had the following exchange with a securities analyst on the Company's fourth quarter 2023 investor conference call:

> Frank Schiraldi [Piper Sandler]: …***I know you got a lot of questions on the REBL loans. People look at that industry, they've seen some pain elsewhere away from you guys***. And you did see some migration into criticized and classified last quarter. Just wondering what you saw this quarter on that front. And then any change to your general thoughts on that paper?

49

***Defendant Kozlowski***: It's -- I think we have a more secure portfolio because there was a real lowering of cap rates and structure structurally in the multifamily market, things like subordinated debt, lower reserves, not buying the proper interest rate. We didn't do any of that. ***We are strict – we're very strict in the underwriting. We -- our portfolio has matured. So it's -- we do have some deferments. This is very natural, though. No write-offs. No, we don't believe any substantial risk of default and loss but as you mature that port, it's hard to know whether it's just a maturing portfolio where you have some people who have finished the projects or it's more based on the economy, it's not abnormal, we're not seeing anything abnormal yet from ours. Now you hear a lot of these stories in the market but those aren't our type of deals. Those aren't with our type of structures in the markets that we inhabit with the type of developers that we have. So we haven't seen the same stress that you might have read about in other areas.***

192.    Defendant Kozlowski's statement concerning the Company's REBL portfolio was materially false and/or misleading, and failed to disclose material adverse facts necessary to render the statements not misleading, because:

a)    Telling investors that the Bancorp is "***very strict in the underwriting***" and further stating: "***Now you hear a lot of these stories in the market but those aren't our type of deals. Those aren't with our type of structures in the markets that we inhabit with the type of developers that we have. So we haven't seen the same stress that you might have read about in other areas***," in response to a question about the recent pain seen in the REBL industry was materially misleading because it assured investors that the Bancorp's REBL loans were different from – and more secure than – the many, many headline-grabbing stories of amateur real estate syndicators (especially in Houston, Texas) who found themselves underwater on multifamily, Class C-housing loans they took out on a variable interest rate basis at the height of the COVID-19 pandemic. But those are exactly the loans that comprised the Bancorp's REBL book, as the Report later revealed, with the loan the Bancorp extended to Kyle Jones – who was working in software sales at IBM

50

until about a year before receiving the $39.4 million loan from the Bancorp –
serving as exhibit A (or, in this instance, Case Study 1);

b) Telling investors that "***No, we don't believe any substantial risk of default***," and
"***we're not seeing anything abnormal yet from ours***" was false and/or materially
misleading because, at the time Defendant Kozlowski said this, the Aubrey had
already missed its December 2023 payment (and possibly also the January 2024
payment) and was rapidly heading towards default, which would happen less than
42 days later. In addition, the apartment complex in Plainfield, New Jersey had
been condemned by the authorities in August 2023 and sustained severe damage in
a fire that sent fifteen people to the hospital in December, and had not been repaired.
Moreover, Defendants characterized these events, which happened in 2023, as
being part of a "shock" and a "wave" and even said in the following quarterly
conference call that "we've had virtually no issues that were similar to this" since
2016—but these events happened in 2023. Accordingly, it was false and materially
misleading to say: "***No we don't believe any substantial risk of default***," and that
Defendants are "***not seeing anything abnormal***" as of January 26, 2024; and

c) Telling investors that "***we do have some deferments. This is very natural, though***,"
is materially misleading because this relates to the apartment complex in Plainfield,
New Jersey that was condemned by the authorities, then sustained a fire that sent
fifteen people to the hospital, and had not been repaired. This is not "very natural"
by any stretch.

II.     *Defendants' First Quarter 2024 Earnings Results and Conference Call Rely on an
Old Appraisal of the Aubrey and Misleadingly Omits the More Recent One in the
Bancorp's Possession, which Materially Overstates the Likelihood that the Company
will Be Able to Sell the Property Without Loss*

51

193.    On April 25, 2024, the Bancorp released 1Q2024 results, and describing the Aubrey this way: "***The $39.4 million loan balance compares to a September 2023 third party 'as is' appraisal of $47.8 million, or an 82% 'as is' LTV***, with additional potential collateral value as construction progresses, and units are re-leased at stabilized rental rates."

194.    On the investor conference call the following day, Defendants made the following statements, repeatedly conveying to investors that loss was not expected on the Aubrey, based on the September 2023 valuation and the resulting LTV:

Defendant Frenkiel [stating in prepared remarks]:

Non-performers increased during the quarter by $7 million for leasing and SBL, but mostly as a result of an apartment building loan for $39.4 million, ***which compares to September 23 independent as-is appraisal of $47.8 million or an 82% as-is LTV with additional potential collateral value as rehabilitation progresses and units are released at stabilized rental rates… Accordingly, even with higher interest rate environment and other stresses, we believe LTVs based upon third-party appraisals continue to provide significant protection against potential loss… We believe that underwriting requirements provide significant protection against loss as supported by LTV ratios based upon third-party appraisals***.

…

Defendant Frenkiel

Well, ***if you look at the LTV as-is, on which you would base potential losses, the value continues to be there***. So that's why we're going to finish up the construction ourselves and preserve that value and actually potentially increase the value as the property gets stabilized.
…

Defendant Frenkiel:

Yes. So we have a budget, a detailed budget, so we have the estimated cost. ***And in fact, even after those expenditures, the 82% loan-to-value will be preserved. So the costs, they get capitalized. There are some reserves available, so it won't be dollar-for-dollar. But as I said, the LTV will still be maintained.***
…

Defendant Frenkiel:

52

***Well, the $39.4 million is the big one. And we've been discussing that. And you have all the information, I think, that we have to ascertain that there is not loss indicated in that property.***

195.    Defendants' continued reliance on the September 2023 third party 'as is' appraisal of $47.8 million, or an 82% 'as is' LTV for the Aubrey, as quoted in the two preceding paragraphs, was materially misleading because it omitted that Defendants had in their possession a more recent appraisal of the Aubrey that was materially lower, and which made the LTV over 100%, revealing that loss was indicated on the property. Furthermore, the more recent appraisal, which the Harris Central Appraisal District sent to Defendants on April 19, 2024, stated: "By law, we must appraise property at market value. Market value is the price for which it would have sold on January 1 [2024] in the open market." January 1, 2024 is four months more recent than September 2023 third party appraisal on which Defendants continued to rely in their statements to investors. Even assuming that Defendants had some basis for believing the September 2023 appraisal was more accurate than the more recent one, it was materially misleading to conceal the more recent appraisal from the market. By touting the September 2023 appraisal, Defendants were dutybound to disclose the more recent one. Failing to do so misled investors into thinking that the likelihood of selling the Aubrey without loss was materially greater than it was.

III.    *Defendants' Second Quarter Earnings Results Continue to Omit the More Recent Aubrey Appraisal and Therefore Overstate the Likelihood the Company Will be able to Sell the Property Without Loss, and Defendants Also Obscure the Reality of the Plainfield, New Jersey Loan*

196.    The Company's 2Q2024 earnings release on July 25, 2024 again stated: "***The $39.4 million loan balance compares to a September 2023 third party "as is" appraisal of $47.8 million, or an 82% "as is" LTV***, with additional potential collateral value as construction progresses, and units are re-leased at stabilized rental rates," referring to the Aubrey.

197.    This statement is false and misleading for the reasons already explained in ¶195 above.

198.    Describing the apartment building in Plainfield, New Jersey, the Company's 2Q2024 earnings release also stated: "Borrowers for a $12.3 million apartment property real estate bridge loan which had a six month payment deferral granted in the fourth quarter of 2023 have not resumed payments, and are reflected in the 60-89 days past due column in the table above."

199.    Defendants' statement is false and/or materially misleading because, by describing the property as having "had a six month payment deferral granted in the fourth quarter of 2023" and "[having] not resumed payments," and not disclosing why the property had to request a deferral and/or not identifying the property as the one in Plainfield, New Jersey that was condemned by the authorities and then sustained major damage in a catastrophic fire, and was still sitting around in a decrepit and fire-scarred state as of March 2024, Defendants misleadingly downplayed the risk (which is only apparent if one knows which property the disclosure is talking about) that the Plainfield, New Jersey property would not return to business as usual as an income-producing property. The statement is especially misleading in the context of Defendant Kozlowski's earlier statement on January 26, 2024 calling the Company's fourth quarter 2023 deferments as "very natural" when the Plainfield, New Jersey situation is anything but.

IV.    *Defendants' Third Quarter Earnings Results Continue to Omit the More Recent Aubrey Appraisal and Therefore Overstate the Likelihood the Company Will be able to Sell the Property Without Loss, and Defendants Continue to Obscure the Reality of the Plainfield, New Jersey Loan*

200.    The Company's issued its 3Q2024 earnings release on October 24, 2024 stating of the Aubrey: "***The [now] $40.3 million loan balance compares to a September 2023 third-party "as is" appraisal of $47.8 million, or an 84% "as is" LTV***, with additional potential collateral value as construction progresses, and units are re-leased at stabilized rental rates."

201.    Continuing to rely on the September 2023 appraisal of the Aubrey and omitting the more recent one – in order to assure investors that the risk of loss on the property was low – was materially false and misleading for the reasons already explained.

202.    Describing the apartment building in Plainfield, New Jersey, the Company's 3Q2024 earnings release stated "The $12.3 million shown in the non-accrual column for real estate bridge loans is collateralized by apartment building property… This loan had a prior six-month payment deferral granted in the fourth quarter of 2024 and did not resume making payments."

203.    By continuing to describe the Plainfield, New Jersey loan as having "had a prior six-month payment deferral granted in the fourth quarter of 202[3]"[19] and stating that it "did not resume making payments," but not disclosing why the property had to request a deferral and/or not identifying the property as the one in Plainfield, New Jersey that was condemned by the authorities and then sustained major damage in a catastrophic fire, the statement was materially misleading to investors for the reasons already explained in ¶192 above.

## LOSS CAUSATION

204.    As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Bancorp's REBL portfolio. These statements inflated the price of Bancorp securities as, if Defendants had instead told the truth, the Bancorp's share price would have dropped. As a result, during the Class Period, Lead Plaintiff and the Class purchased the Bancorp's securities at artificially inflated prices. The price of the Company's securities significantly declined when the misrepresentations made to the market were corrected, and/or the information alleged herein to have been concealed from the market was revealed and/or the risks thereof materialized, causing investors' losses.

---

[19] The filing says "fourth quarter of 2024" but Plaintiff believes that to be a typo in the filing.

205.    On February 29, 2024, the Bancorp filed its 2024 10-K, where it disclosed an increasing trend in substandard loans, a corresponding increase in the fourth quarter provision for credit loss on the loans, and also that the borrower for a $39.4 million REBL loan collateralized by an unnamed apartment complex in Texas had missed the required payments in December 2023, January 2024, and February 2024.

206.    The Bancorp's share price reacted to this news concerning the increase in substandard loans, falling by 5% on March 4, 2024 and another 4% on March 5, 2024 on unusually heavy trading volume.

207.    Market reaction confirmed that the stock price decline was caused by the trouble in the REBL book revealed in the 2024 10-K. For instance, Piper Sandler released an analyst report on March 5, 2024 on the Bancorp entitled: *10-K Filing Provides Incremental Detail on REBL Book*. The report began: "We believe weakness in shares yesterday reflect a delayed reaction to the bank's 10-K filing late last week coupled with investor hyper-focus on CRE [commercial real estate]. In the filing, TBBK disclosed two items of particular interest. First, the bank saw criticized balances in its REBL book increase from 5% to 6.4%. Secondly, the bank disclosed that one of its largest REBL loans on a Houston multifamily building has been delinquent since December."

208.    On March 21, 2024, Culper Research released the Report, revealing that the Bancorp's REBL loan book is much weaker than Defendants have represented, that it is "rife with unsophisticated syndicated borrowers," and that many of the loans are to "syndicators with 'get rich quick' dreams who believed that they could easily rehab units, fill them with tenants, increase rents, and cash out for quick 'passive' returns."

209.    On this news, the Bancorp's stock plunged, losing over 10.15% of its value on March 21, 2024, on unusually heavy trading volume.

210.    News reports confirmed the stock price drop was caused by the revelation of the negative news about the Bancorp's REBL loan book. For instance, stock market research and news site TipRanks linked the decline in Bancorp's stock to the news uncovered in the Report in a post that day entitled: *Culper Research short the Bancorp, says 'misrepresented' REBL portfolio.*[20]

211.    On April 26, 2024, the Bancorp held its earnings call for the first quarter of 2024, during which Defendant Kozlowski admitted that the Bancorp's REBL book was experiencing a systemic "wave" of trouble flowing from the 2021 and 2022 vintage REBL loans.

212.    On the news that there was, in fact, a "wave" of distressed loans in the Bancorp's REBL assets, the Bancorp stock dropped over 8% on April 26, 2024, on unusually heavy volume.

213.    Market reaction confirmed that the stock price decline was caused by the wave of the Bancorp's nonperforming REBL assets. Piper Sandler opined in an April 26, 2024 analyst report that: "While the $39.4M REBL loan migrating into NPAs was expected, we also got the sense criticized/classified/delinquencies will see additional migration when the 10-Q is filed, albeit at a decelerated pace. We believe the lack of detail provided here on the call is a driver of share price underperformance."

214.    On October 25, 2024, the Bancorp held its earnings call for the third quarter of 2024, which centered on the sharp uptick in its distressed loans, both in the substandard and special mention categories, as well as the new qualitative factor added to the ACL for the REBL loans in the quarter as a result of the rising special mention and substandard loans in the Bancorp's REBL book.

---

[20]    *See*    https://www.tipranks.com/news/the-fly/culper-research-short-the-bancorp-says-misrepresented-rebl-portfolio.

215.    On this news, the Company's share price fell $7.95, or 14.47%, to close at $47.01 per share on October 25, 2024, on unusually heavy trading volume.

216.    Market reaction confirmed that the stock price decline was caused by the continued deterioration of the Bancorp's REBL book, with Piper Sandler observing on October 25, 2024: "Continued significant credit migration in REBL book. The book continues to show meaningful credit migration. Criticized and classified balances were up another 30% lq (migration was similar in 2Q) growing from 8.3% to 11.0% of the total book. We also saw significant migration within categories from special mention into substandard. Mgmt noted in the release that based on its analysis as well as an independent third party review, it believes criticized balances are approaching or have already reached peak and sees considerable opportunity to reduce these levels over the next few quarters."

217.    On March 26, 2025, the Bancorp announced in an 8-K that the sale of the Aubrey had been delayed, with the purchaser having the option for two additional extensions.

218.    On this news, the Bancorp stock price fell over 5% on March 26, 2025, on unusually heavy volume.

219.    Market reaction linked the stock price decline to the latest news concerning the delay of the Aubrey sale. In a report published on March 26, 2025, Piper Sander wrote: "In an 8K this morning TBBK announced another delay in the sale of its large OREO. As we wrote last week (see note here) a successful sale would have been another dagger for shorts. Obviously having a sale agreement in place to collect par is only helpful if it gets executed... A sale would have made investors feel warm and fuzzy inside and now the uncertainty still lingers."

## A FORMER MANAGING DIRECTOR CONFIRMED DEFENDANT KOZLOWSKI'S INVOLVEMENT WITH EACH AND EVERY LOAN IN THE REBL BOOK

220.    Former Employee 1 ("FE-1") served as a Managing Director at the Bancorp from July 2018 to December 2020, focusing on REBL loans. He reported to the Executive Vice President of the Company who was in charge of the Company's real estate bridge loan portfolio.

221.    According to FE-1, Defendant Kozlowski had to approve each and every loan and was therefore aware of the details of all of the Bancorp's REBL loans. FE-1 believes that, after FE-1 left the bank, Defendant Kozlowski continued "approving every loan they make."

222.    FE-1 also confirmed that Olek DeRowe is now in charge of the Company's REBL department, and added that DeRowe's previous role included compiling data on each individual loan in order to classify the risk level of the Company's REBLs on a loan-by-loan as well as a portfolio-wide basis.

223.    FE-1 stated that said the REBL department was a "huge profit center" and that Defendant Kozowski was paying close attention for that reason.

224.    FE-1 further explained that Defendant Kozlowski, along with his chief credit officer, made up the credit committee that had to approve every loan, reiterating that Defendant Kozlowski was "intimately involved" in the Company's REBL loans.

## CLASS ACTION ALLEGATIONS

225.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased the publicly traded common stock of the Bancorp between January 26, 2024 and March 25, 2025, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are: (a) persons or entities who suffered no compensable losses; (b) Defendants; the present and former officers and directors of Bancorp at all relevant times; members of such excluded

persons' immediate families and their legal representatives, heirs, successors, or assigns; and (c) any entity that any person excluded under subsection (b) controlled or has or had a material ownership interest at any time.

226.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members in the proposed Class. Millions of Bancorp shares were traded publicly during the Class Period on NASDAQ. Record owners and other members of the Class may be identified from records maintained by Bancorp or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

227.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

228.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

229.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of the Bancorp and its book of REBL loans; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

230.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

231.    The market for the Bancorp common stock was open, well-developed and efficient at all relevant times. Had Defendants spoken the truth rather than the misrepresentations, the Bancorp stock price would have declined. As a result of the misrepresentations, the Bancorp shares traded at inflated prices. Plaintiff and other members of the Class purchased the Company's securities relying upon the integrity of the market price of the Bancorp's securities and market information relating to the Bancorp, and have been damaged thereby.

232.    At all relevant times, the market for the Bancorp's common stock was an efficient market for the following reasons, among others:

(a)    The Bancorp's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, the Bancorp filed periodic public reports with the SEC and/or the NASDAQ;

(c)    The Bancorp regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    The Bancorp was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

233.    As a result of the foregoing, the market for Bancorp securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the share price. Under these circumstances, all purchasers of the Bancorp's securities during the Class Period suffered similar injury through their purchase of Bancorp securities at artificially inflated prices and a presumption of reliance applies.

234.    In the alternative, a Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Because the Class's claims are, in large part, grounded on Defendants' omissions of adverse information, which Defendants had a duty to disclose, regarding the Bancorp's business operations and financial prospects, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the withheld information, as set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

235.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Bancorp who knew that the statement was false at the time it was made.

## CAUSES OF ACTION

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants**

236.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

237.    This Count is asserted against Defendants for violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

238.    During the Class Period, Defendants did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase the Bancorp's securities at artificially inflated prices.

239.    Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in an effort to maintain artificially high market prices for the Bancorp's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

240.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Bancorp's financial well-being and prospects, as specified herein.

241.    Defendants knew the misstatements alleged above were false and misleading or were reckless in not knowing.

242.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that the Bancorp's REBL book was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their Bancorp securities or would have paid a lower price.

243.    By reason of the foregoing, Defendants violated Section 10(b) and Rule 10b-5 and are liable to Plaintiffs and the Class for damages.

244.    This action was filed within five years of each Class member's purchase of the Bancorp's shares and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

245.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

246.    Individual Defendants acted as controlling persons of the Bancorp within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

247.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

248.    As set forth above, the Bancorp and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

249.    This action was filed within five years of each Class member's purchase of the Bancorp's shares and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action; and

(d)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 22, 2025                    Respectfully submitted,

**GRANT & EISENHOFER P.A.**

*/s/ Michael J. Barry*
Michael J. Barry (Bar No. 4368)
Jeff A. Almeida
123 Justison Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 622-7122
mbarry@gelaw.com
jalmeida@gelaw.com

*Liaison Counsel for*
*Lead Plaintiff and the Class*

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen
Phillip Kim
Michael Cohen (pro hac vice forthcoming)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
lrosen@rosenlegal.com
philkim@rosenlegal.com
mcohen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*